**Appeal of: C.C., Appellant.**

Superior Court of Pennsylvania.

Argued May 15, 2012.
Filed Sept. 21, 2012.

ful review, we reverse and remand for entry of a custody order consistent with this opinion and further proceedings.

Mother and Father never married. A.B. and Z.B., ages six and five respectively, were conceived while Mother was married to Husband. At that time, Mother, Father, and Husband resided together in an apartment in Newark, New Jersey. However, prior to A.B.'s birth, the family moved to a home that Grandparents, Mother's adoptive parents, purchased during January of 2005 because they did not approve of the family's neighborhood and they wanted A.B. to "have a backyard to grow up in." N.T., 12/13/11, at 19, 76. Grandparents charged Mother, Father, and Husband $1,000 monthly rent. *Id.* at 21, 70–73.

During June 2007, the New Jersey Department of Youth and Family Services ("DYFS") intervened as a result of a spiral fracture A.B. sustained to her leg. *Id.* at 16. The agency placed A.B. and Z.B. in Grandparents' care pending an investigation. Grandparents resided in Bloomingdale, New Jersey with their twenty-six-year-old son. *Id.* at 15. While the agency completed its investigation in approximately six months, finding that A.B. was not the victim of physical abuse,[4] the children

Richard H. Yetter, III, Easton, for appellant.

John W. Rybak, Bethlehem, for J.E.B., appellee.

Ellen S. Kingsley, Easton, for V.B. and C.B., appellees.

BEFORE: BOWES, DONOHUE, and COLVILLE,* JJ.

OPINION BY BOWES, J.:

C.C. ("Father") appeals from the order entered on December 20, 2011, wherein the trial court awarded V.B. ("Grandmother") and C.B. ("Grandfather"), maternal grandparents, hereinafter referred to collectively as "Grandparents," legal custody and primary physical custody of A.B. and Z.B., who were born of Father's polyamorous[1] relationship with J.E.B. ("Mother")[2] and her husband, B.J. ("Husband"). Mother and Father, who maintain separate households, each were awarded two non-consecutive overnight periods of partial physical custody per month.[3] After care-

---

* Retired Senior Judge assigned to the Superior Court.

1. Merriam–Webster defines polyamory as "the state or practice of having more than one open romantic relationship at a time." *See* Merriam–Webster Online Dictionary (2012), *available at,* www.Merriam–Webster.com.

2. Although Mother did not appeal the custody order, as an appellee, she filed a brief on April 2, 2012, wherein she joined Father in seeking relief from the trial court's order. The trial court's Rule 1925(a) opinion referenced correspondence dated February 3, 2012, from Mother's counsel that indicated Mother moved out of state; however, that assertion is not supported by documentation in the certified record. *See* Trial Court Opinion, 2/8/12, at 4.

3. Mother and Father were required to **split** weekend physical custody, *i.e.,* "[Mother] shall have partial custody from 6 PM Friday to 5 PM Saturday. [Father] shall have custody from 5 PM Saturday to 6 PM Sunday." Trial Court Order, 12/20/11, at 8.

4. DYFS's precise determination is unclear and none of the parties presented pertinent documentation from the agency. Grandfather testified that DYFS ruled that the injury was abuse but nevertheless returned the children to Mother and Father because the birth parents moved out of the jurisdiction. N.T., 12/13/11, at 23–24. However, Mother clarified that the agency determined that the injury, which occurred while A.B. was playing with Husband, was accidental. N.T., 12/14/11, at 9, 20–21, 32. She further ex-

remained with Grandparents for approximately nine additional months due to bureaucratic formalities. N.T., 12/14/11, at 9, 20, 32, 68–69. Grandparents opposed reunification. N.T., 12/13/11, at 23. Eventually, the agency returned the children to Mother and Father during September 2008. *Id.* at 44.[5] Meanwhile, during October 2007, Grandparents evicted Mother, Husband, and Father, and the triad moved to an apartment in Bethlehem, Pennsylvania. *Id.* 21, 73.

In 2007, Mother, Husband, and Father opened their relationship and their home to L.C. ("Stepmother"), whom Father subsequently married during 2008, and with whom he had a daughter. Thus, after September 2008, A.B. and Z.B. lived with Mother, Husband, Father, Stepmother, and their half-sister until Father severed his polyamorous bonds and moved his wife and child to an adjoining apartment in the same building. N.T., 12/14/11, at 62, 67, 70. Father and Stepmother later moved from that apartment building to their current residence in April 2010. *Id.* Husband subsequently moved to Texas and filed for divorce. *Id.* at 4–5. Mother is currently in a monogamous relationship with M.N., and they have a one-year-old son. *Id.* at 4, 23.

After the four-way polyamorous relationship between Mother, Husband, Father, and Stepmother dissolved, Mother and Father assented to a shared custody schedule wherein Grandparents had partial custody of the children on alternating weekends. *Id.* at 45, Custody Order, 3/6/09, at unnumbered page 2. Mother and Father, who reside within walking distance, shared legal custody and rotated periods of primary physical custody during the week. N.T., 12/13/11, at 25–26. Mother and Father remain cordial and practice co-parenting. N.T., 12/13/11, at 47; N.T., 12/14/11, at 7, 32, 45. While Mother does not have any apparent animosity toward Grandparents, Father's relationship with Grandparents is openly hostile and uncooperative. N.T., 12/13/11, at 39, 50–51. In fact, Mother characterized the interactions between Father and Grandparents as a "disaster." N.T., 12/14/11, at 16. In contrast, she described her relationship with Grandparents as amicable. *Id.* at 9. Grandparents provided and continued to provide Mother with various forms of financial support including cash advances, a lawyer to represent her in her divorce proceedings against Husband, rent, use of a motor vehicle, and a cleaning service to clean her apartment twice a month. N.T., 12/13/11, at 69, 78; N.T., 12/14/11, at 9–10.

On February 11, 2011, Grandparents filed a petition to modify the existing custody order wherein they requested, *inter alia*, that either they or Mother receive primary physical custody. Father countered with a petition to modify the custody arrangement wherein he requested that the trial court confirm his shared legal custody with Mother and award him primary physical custody. Not to be excluded, Mother also filed a petition to modify custody that requested primary physical custody of the children. On April 1, 2011, the trial court ordered Northampton County Children Youth and Families ("CYF") to conduct a comparative home custody evaluation, which CYF performed on Mother's and Father's residences on

---

plained that Father was on a different floor of the residence when the accident occurred and the agency's concern with the family stemmed from the condition of the home—not the abuse allegations. *Id.* at 32. Father confirmed Mother's account of the incident and DYFS's investigation. *Id.* at 69.

**5.** While Grandfather testified that the agency returned the children during September 2009, the certified record confirms the correct date to be September 2008.

June 4 and 7, 2011. Even though the order made accommodations for parties who lived outside of Northampton County to secure an evaluation, Grandparents' residence in New Jersey was never assessed. Instead, Grandparents were permitted to introduce an expired foster home license that was issued in 2008. The trial court accepted the expired foster care license as evidence demonstrating both the appropriateness of Grandparents' residence and that they were "better suited to nurture and develop the minor children," yet it summarily disregarded CYF's court-ordered custody evaluation which revealed, *inter alia,* that Father's home was reasonably clean and adequate, that A.B. excelled in school during the 2010–2011 academic year, and that A.B. disfavored continuing visitation with Grandparents. *See* Trial Court Opinion, 2/8/12, at 17.

In addition, the trial court granted Grandparents' petition to compel Stepmother to submit to a psychological evaluation by an evaluator who they selected and compensated. However, the trial court subsequently sustained Grandparents' objection to admitting their previously requested court-ordered psychological report without their evaluator's in-court testimony.

On December 20, 2011, following a two-day custody trial wherein the court interviewed both children *in camera,* the trial court awarded Grandparents primary physical custody of A.B. and Z.B. and granted Mother and Father each two nonconsecutive days of partial custody per month, portions of certain holidays, and one week during summer vacation. In addition, the court granted Grandparents sole legal custody of the children *sua sponte.* Father filed this timely appeal on January 9, 2012, and he complied with Pa.R.A.P. 1925(a)(2)(i) by filing a statement of errors complained of on appeal concurrent with his notice of appeal.

Father presents the following issues for our review:

I. Did the trial court err and abuse its discretion by not considering the presumption of custody in favor of a parent over a third party and then not considering whether the third party rebutted that presumption by clear and convincing evidence in accordance with 23 Pa. C.S. § 5327(b) after it found "all parties capable of performing parental duties, weighted in the favor of the plaintiffs' "?

II. Did the trial court err and abuse its discretion by not recusing itself after discovering that the trial court had heard a separate custody action years prior concerning [Stepmother] and her children causing partiality and prejudice against [Father]?

Father's brief at 10 (footnote omitted).

We recently reiterated the applicable scope and standard of review as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court. *A.D. v. M.A.B.,* 989 A.2d 32, 35–36 (Pa.Super.2010) (internal citations omitted).

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa.Super.2012).

At the outset, we observe that the new Child Custody Act, 23 Pa.C.S. §§ 5321–5340, applies to the case at bar because Grandparents filed their petition to modify the existing custody order after January 24, 2011, the effective date of the new law. *See E.D. v. M.P.*, 33 A.3d 73 (Pa.Super.2011). We further note that the trial court complied with the new custody law by explicitly examining each of the factors enumerated in § 5328 in reaching its best-interest determination and discussing the factors in its custody order and opinion. However, as addressed *infra*, in analyzing several of the relevant factors delineated in § 5328, the trial court injected artificial morality concerns that the legislature has deemed irrelevant.

As identified by our legislature, the relevant factors to consider when awarding custody are as follows:

(a) **Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328.

The crux of Father's first complaint is that the trial court ignored the well-established legal principle that there exists a rebuttable presumption in favor of birth

parents over third parties in custody disputes. *See Charles v. Stehlik,* 560 Pa. 334, 744 A.2d 1255 (2000). In *Charles,* our Supreme Court reasoned,

> where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a prima facie right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

*Id.* at 1258 (internal quotations and brackets omitted). Our legislature recently codified this principle in 23 Pa.C.S § 5327(b), which states in pertinent part, "In any action regarding the custody of the child between a parent of the child and a non-parent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S. § 5327(b). We have explained, "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re B.C.,* 36 A.3d 601, 605–606 (Pa.Super.2012).

Addressing the appropriate methodology in the context of the common law presumption, we elucidated

> What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.

*McDonel v. Sohn,* 762 A.2d 1101, 1107 (Pa.Super.2000) (quoting *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512, 513–514 (1980)). In *Ellerbe, supra* at 514, our Supreme Court noted that "these principles do not preclude an award of custody to the non-parent. Rather they simply instruct the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy." Essentially, the Supreme Court determined, "where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents." *Ellerbe, supra* at 514.

In rejecting Father's position in its Rule 1925(a) opinion, the trial court was convinced that, although it did not specifically invoke the statutory presumption in favor of birth parents or declare that Grandparents shouldered their burden of rebutting the presumption by clear and convincing evidence in its best-interest analysis, the Grandparents "introduced enough evidence to overcome the statutory presumption in favor of the biological parents." Trial Court Opinion, 2/8/12, at 7.

In support of its hindsight conclusion, the trial court pointed to the purportedly clear and convincing evidence regarding (1) the New Jersey Department of Youth and Family Services's intervention in 2007; (2) the children's continued development during the fifteen months they were placed with Grandparents; (3) Mother's and Father's prior involvement with polyamory; (4) testimony that Father was not engaged in the children's activities as much as Mother would like; and (5) Stepmother's apparent sexual proclivities and her prior unsuccessful custody litigation before the trial court. *Id.* at 7–9. Hence, the court found that in light of the foregoing circumstances, Grandparents rebutted the statutory presumption in favor of Mother and

Father. *Id.* at 9. For the following reasons, we disagree.

At the outset, we observe that Father raises a variety of arguments supporting his general claim that the trial court ignored the statutory presumption in favor of birth parents. While most of Father's complaints challenge the trial court's credibility determinations, a deferential function that we will not disturb on a cold record, we agree with Father's related contention that the trial court's conclusions are unreasonable in light of the certified record. *See C.R.F., supra.*

■ Indeed, our admittedly circumscribed standard of review does not preclude this Court from finding that a trial court abused its discretion in fashioning a custody order. While prudence dictates that we exercise our authority sparingly, we are not powerless to rectify a manifestly unreasonable custody order. *Cf. J.R.M. v. J.E.A.,* 33 A.3d 647 (Pa.Super.2011) (imposition of restrictions on Father's periods of partial custody are unreasonable in light of the evidence of record); *Collins v. Collins,* 897 A.2d 466 (Pa.Super.2006) (conclusions on which trial court based its award of primary physical custody were unreasonable); *Fox v. Garzilli,* 875 A.2d 1104 (Pa.Super.2005) (trial court's evaluation of and weight attributed to relevant factors regarding school attendance was unreasonable); *Landis v. Landis,* 869 A.2d 1003 (Pa.Super.2005) (in denying petition for relocation, custody court fashioned conclusions that are manifestly unreasonable in light of evidence presented).

■ Notwithstanding the trial court's retrospection and revised best-interest analysis, our review of the certified record reveals that the trial court failed to apply the statutory presumption when it divested Father of legal custody of his children and severely reduced his interaction with A.B. and Z.B. from shared physical custody to one day of physical custody every other week. In fact, nothing in the record supports the trial court's after-the-fact assertion that it considered the heightened standard of production when it issued the custody order. Most tellingly, in addressing the relevant factors under § 5328, and in direct violation of the noted presumption, the trial court reasoned as follows, "The Court finds all parties capable of performing parental duties, weighted in favor of [Grandparents]." Trial Court Order, 12/20/11, at 5.[6]

■ Nevertheless, despite recognizing Father's capable parenting abilities, the trial court elected to decrease his physical custody based primarily upon DYFS's intervention during 2007, Father's previous experiment with a polyamorous lifestyle, and the trial court's undisclosed factual findings that it assessed against Stepmother in an unrelated custody dispute. However, Father was absolved of wrongdoing in connection with the 2007 invention. Hence, the court's decision to weigh the 2007 incident against Father must be categorically rejected. In reaching its implicit conclusion that Grandparents overcame their evidentiary burden, the trial court also relied heavily upon Father's prior polyamorous lifestyle. The trial court stated that it "did not judge 'polyamory' itself as immoral or unethical" and only considered Father's former involvement with the lifestyle to demonstrate that it was "unworkable in this instance." *See* Trial Court Opinion, 2/8/12, at 8. However, despite the

---

6. The trial court's statement is imprecise. It is unclear whether the trial court reasoned that Mother's and Father's parenting capabilities were a testament to Grandparents' intermeddling or whether Grandparents are simply more capable parents. Under either interpretation, however, the certified record does not bear out that Grandparents shouldered the burden of rebutting the evidentiary presumption in Father's favor.

trial court's protestations to the contrary, the record reveals the trial court's general disfavor of polyamory weighed in its custody determination. For example, the court's rationale ignored the fact that Father was not currently involved in polyamory and that, while ultimately unsuccessful, his former experimentation with that lifestyle did not harm the children and does not currently affect the children negatively. Hence, the trial court's observation that polyamory was unworkable in this situation was irrelevant. It fails to support its concomitant conclusion that the unorthodox lifestyle was detrimental to the children in this case. Indeed, none of the empirical evidence that the trial court cites in support of its position sustains this inference. In actuality, the evidence established only that the prior polyamorous relationships failed among the adults. Since the trial court did not identify anything in the certified record to support its finding that the polyamorous relationship was deleterious to the children, we must reject the implication that Father's former participation in polyamory is detrimental to the children at this juncture or that it can be used to overcome the presumption in favor of Father's custody.[7]

In *Michael T.L. v. Marilyn J.L.*, 363 Pa.Super. 42, 525 A.2d 414, 416–418 (1987), we reiterated that a parent's previous sexual conduct is not a relevant consideration in custody proceedings unless competent evidence demonstrates that the conduct has an adverse effect on the child. *See also Commonwealth ex rel. Holschuh v. Holland–Moritz*, 448 Pa. 437, 292 A.2d 380, 384 (1972) ("[I]t has been held that even a moral lapse by the mother will not warrant depriving her of custody, as long as the lapse does not involve the treatment and care of the children"); *cf. Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587, 589–590 (1976) (collecting cases) ("it is the effect of the nonmarital relationship on the child and not the fact of the relationship itself which is crucial to a custody decision"); *Brooks v. Brooks*, 319 Pa.Super. 268, 466 A.2d 152, 155–156 (1983) (same). *Michael T.L., supra,* addressed the trial court's consideration of a mother's sexual promiscuity as a ground to award custody of her son to the father. Upon review of the record, this Court held that the trial court improperly emphasized the mother's prior sexual exploits. *Id.* at 416, 420. Relying upon established precedent, we concluded that the law did not presume that the mother's previous sexual indiscretions affected her son adversely. *Id.* at 418. Thus, instead of permitting the trial court to presume the adverse impact of the mother's promiscuity, we found that the law required the father, as the party seeking to invoke the allegedly immoral behavior, to establish the negative effect of the mother's conduct by competent evidence. *Id.* As the record in that case did not reveal an adverse effect upon the child that could be attributed to the mother's active sex life, we reversed the order awarding custody to the father. We reasoned as follows:

> The mother testified to having an active sex life. She also testified that these activities only took place when her son was with his father on alternate weekends. (N.T. 1/6/86 at 38). The record viewed in its entirety contains count-

---

7. While not cited by the trial court, the only potential detriment that the certified record would sustain is that A.B. refers to Mother as "Ima" and calls Stepmother "mommy" because those were the names the adults selected for themselves when the polyamorous family resided together during 2008. Mother explained that she selected "Ima," the Hebrew translation of mother, because she was not comfortable being called mom and the alternate moniker reflected the Jewish faith of her birth parents and the faith that she desired for her children. N.T., 12/14/11, at 17.

less sexual innuendos by the father and his witnesses concerning the mother's lifestyle but very little substance regarding the detriment to which the boy was subjected by his mother's social behavior.

*Id.*

The case at bar is similar to *Michael T.L., supra,* in that the trial court focused a significant portion of its best interest analysis on Father's prior involvement with polyamory, a nontraditional sexual practice. However, like the record before the trial court in *Michael T.L.,* there is a dearth of evidence in the certified record to sustain the proposed conclusion that Father's practice of polyamory was adverse to A.B.'s and Z.B.'s best interest. Accordingly, the trial court erred in weighing its preconceptions of Father's experience with that sexual arrangement against him. *See Michael T.L., supra* at 418 ("Without evidence of a harmful effect on the child, a parent's past conduct should have little weight in making a custody decision."); *see also Johns v. Cioci,* 865 A.2d 931, 942 (Pa.Super.2004) ("Unless it is shown that a parent's conduct has had a harmful effect on the child, that conduct should be given little weight in custody determinations.").

◼ Having concluded that the trial court erred by invoking Father's prior participation in polyamory as a ground to award legal custody and primary physical custody of A.B. and Z.B. to Grandparents, we review whether the court's remaining discussion addressing the factors enumerated in § 5328 establishes that Grandparents' evidence was so weighty as to "bring the scale up to even, and down on [their] side." *Ellerbe, supra* at 514. For the following reasons, we find that the evidence Grandparents adduced during the custody hearing failed to rebut the presumption in Father's favor under § 5327. Therefore, we conclude that the trial

court's decision to strip Father of legal custody and decrease his periods of physical custody to two nonconsecutive periods of partial physical custody per month is manifestly unreasonable.

Mindful of our standard of review, we do not disturb any portion of the trial court's rationale that the certified record supports. For example, while we do not challenge the court's finding that Stepmother attempted to influence A.B.'s testimony during the *in camera* hearing, we must reject the court's conclusion that Grandparents are more open to compromise than Father. Simply stated, the record bears out the former finding and belies the latter. The following discussion of § 5328 factors confronts only the aspects of trial court's conclusions that cannot be sustained by the certified record.

As it relates to the second statutory factor concerning allegations of past or present abuse, the trial court either ignored or failed to recognize Grandparents' inaction as parents to Mother's allegations of sexual abuse by her paternal uncle. During the evidentiary hearing, Mother reiterated the allegations that her uncle raped her over a seven-year period while she was a child. N.T., 12/14/11, at 43. While it is unclear whether the rape allegations resulted in anything other than Mother's participation in psychological counseling, in relation to Grandparents' indifference for their daughter's wellbeing, Mother testified that Grandfather ignored her objections and dictated that Mother invite the alleged rapist, his brother, to her wedding. *Id.* Aside from the sheer revulsion we have for Grandparents' possible countenance of the sexual assault perpetrated on Mother while she was a child, we also are troubled by the trial court's laxity in failing to delve into this important issue prior to granting Grandparents sole legal custody and primary physical custody of

six-year-old A.B. and her five-year-old brother. Indeed, mindful of the trial court's preoccupation with Mother and Father's morality in relation to their prior involvement with polyamory and Stepmother's alleged sexuality, we are alarmed by the trial court's utter failure to confront Mother's allegations of sexual abuse by a family member or acknowledge the manner that Grandparents elected to address those allegations by demanding the alleged rapist's presence at Mother's wedding.

Likewise, in addressing the fourth factor, *i.e.*, the need for stability and continuity in the children's education, family life, and community life, the trial court summarily concluded that Father cannot provide stability. Trial Court Order, 12/20/11, at 5. While the court purported to emphasize A.B.'s and Z.B.'s need for continuity and stability, it failed to explain how disrupting Father's shared primary custody and reducing the children's weekly contact with Father to two non-consecutive days per month promoted continuity or stability. If the trial court truly was concerned about continuity, it would have upheld the shared custody arrangement between Mother and Father, two admittedly capable parents with no safety concerns. Instead, the trial court elected to further undermine the primary caregivers' parental authority and curb their contact with the children. In light of the evidence of record, the trial court's decision to prohibitively restrict Father's contact with his children is anathema to continuity and stability.

The trial court sought to bolster its reasoning by again artificially injecting morality into this factor—a thinly-veiled reference to Father's prior experimentation with polyamory and Stepmother's alleged sexual interests, even though the legisla-

ture declined to attach morality concerns to this factor relating to stability and continuity in the children's lives.[8] Indeed, in addressing this factor in its Rule 1925(a) opinion, the trial court further expounded on Stepmother's friendship with a professional dominatrix who performed at Wicked Faire, an adult-themed convention, and a blog post printed during August 2008 wherein Stepmother described herself as a "closet poly." The trial court failed to explain, however, how Stepmother's personal friendship, a nearly three-and-one-half-year-old blog posting, and her alleged sexual interests currently affect the children's "stability and continuity in the [their] education, family life, and community life." *See* 23 Pa.C.S. § 5328(a)(4). The trial court's preoccupation with these morality issues is improper, particularly where, as here, there is a dearth of evidence to suggest that the sexual practices affected the children at all.

Turning to the thirteenth factor, which addresses the level of conflict between the parties and their respective willingness to cooperate, the trial court found that the current conflict between Grandparents and Father is diminishing and noted that its custody order, which divests Father entirely of the legal custody of his children that he possessed since their return from DYFS placement in 2007, will ameliorate the conflict. The trial court's rationale not only misperceives the extent of the fractured relationship between Father and Grandparents and its effect on the children, the court also ignored competent evidence outlining Grandparents' officious intermeddling with Father's parenting. Further, it rewarded Grandparents for their interference by granting them sole legal custody.

8. The trial court repeated this flawed analysis in discussing the ninth and tenth factors relating to maintaining loving relationships with the children and attending to the children's daily needs, respectively.

The record reveals that no party is perfect and that all three contribute to the ongoing hostilities. Father is stubborn and fiercely protective of his parental authority. Grandparents are equally obstinate, and their overbearing and manipulative nature resonates throughout the certified record. Grandparents interfered with Mother's and Father's parenting methodically, and when they disagreed with Mother's and Father's decisions, they purposefully undermined their parental authority. During the evidentiary hearing, Mother opined that in addition to utilizing diametrically opposed parenting styles, Grandparents resent Father due to his involvement in the polyamorous relationship with Mother and Husband. N.T., 12/14/11, at 42. For his part, Father resents Grandparents' persistent interference with parental matters. *Id.* She also noted that neither Father nor Grandparents adequately shield the children from their disputes. *Id.* at 56.

For example, prior to confronting Father about his apparent prohibition on the children eating dessert while in their care, Grandparents first directed A.B. to call Mother and instructed Mother to inform A.B. that she could disregard Father's wishes. *Id.* at 35–36. Rather than supporting Grandparents' attempts to manipulate A.B. into disobeying Father, Mother comforted her daughter, explained that it was a disagreement among adults, and reminded her that she did nothing wrong. *Id.* at 36. Although A.B. was satisfied with the manner that Mother handled the situation, Grandparents unfortunately did not follow Mother's lead. *Id.* Instead, upon transferring custody of the children to Father that evening, Grandmother initiated an altercation with Father about the subject in the children's presence. N.T., 12/13/11, at 29–30; 97–99. The ordeal quickly escalated into an episode wherein Stepmother called Grandmother a "c——t" and Grandfather threatened to "beat the shit out of [Father]." N.T., 12/13/11, at 30, 31, 98–99; N.T., 12/14/11, at 122, 137.

Both parties' actions were reprehensible. Had cooler heads prevailed and the parties behaved as adults, Grandparents would have discovered that Father had not proscribed the children from eating desserts during their visits with Grandparents generally; he simply wanted the children to avoid sugary snacks that evening so they could fall asleep more easily. N.T., 12/14/11, at 74. In fact, Father raised similar issues with Grandparents in the past, but since Grandparents did not share his concern, they simply disregarded his requests. N.T., 12/13/11, at 58–59.

On another occasion, Grandmother entered Father's residence uninvited in order to prepare the children for an anticipated custody transfer. She explained that after knocking on Father's front door, activating the doorbell, and still getting no response, she found the doorknob on the closed front door was unlocked, entered Father's home, and called out to alert him to her presence. *Id.* at 91, 201. Grandmother discovered A.B. and Z.B. in the living room watching television, and she began to prepare the children for their departure. *Id.* at 91–92. During the hearing, Grandmother stated, "Well, I don't know where mommy and daddy are, but it's time to come to Ima's house. So we started—they started to get their coats. And all the while getting them ready, I'm thinking I was giving [Stepmother and Father] a hand." *Id.* at 92. Not surprisingly, Father did not find Grandmother's uninvited presence in his living room to be very helpful. *Id.* Instead, after discovering Grandmother in his home, he demanded that she leave immediately and cautioned her not to enter his home without permission. *Id.* The episode escalated needlessly when Stepmother sought to reiterate Father's displeasure with Grandmother. *Id.* at 92–93.

Grandmother's explanation for her actions is insightful. Characterizing the children as "looking disturbed and frightened" when she initially entered the home, Grandmother explained that she continued farther into the residence to soothe the children. *Id.* at 91. It is ironic that Grandmother relied upon the children's apprehension as justification to intrude farther into Father's home when it was her uninvited presence in Father's home and the anticipated clash that her presence in the home would cause that most likely created the children's distress in the first place. Grandparents appear to be oblivious to the delicate realities of the family dynamic.

In contrast, Mother provided a perceptive glimpse into her familial relationships when explaining Grandmother and Grandfather's peculiar inclination to shower with A.B. and Z.B., respectively. While Father found the practice unfathomable and filed a petition for a Protection From Abuse order against Grandparents, Grandparents viewed their actions as innocent and ordinary. Mother's viewpoint split the difference between the opposing extremes. She testified that Grandparents' practice of showering with the children was strange but not inappropriate. N.T., 12/14/11, at 38. Tellingly, after proffering a benign attitude on the topic, Mother continued that if a child welfare agency found the custom was improper, she would defer to its expertise. *Id.*

Despite these incidents and similar evidence highlighting the hostility generated by Grandparents' persistent encroachment upon Father's parental authority, the trial court awarded Grandparents sole legal custody and primary physical custody of the children. Essentially, the trial court concluded that it was in A.B.'s and Z.B.'s best interest to alleviate the disputes by placing the children with Grandparents rather than admonishing Grandparents for consistently usurping Father's authority. Again, this conclusion is unreasonable.

For all of the foregoing reasons, we find that the certified record cannot sustain the trial court's finding that Grandparents presented clear and convincing evidence to rebut the presumption in Father's favor. Herein, the trial court found Father a capable parent, but reasoned that in light of his prior involvement with polyamory, the care Grandparents provided the children for fifteen months during 2007 and allegations of Stepmother's sexual predilections, Grandparents were better suited to foster A.B.'s and Z.B.'s development. Had the parties started on a level playing field, we would be disinclined to disturb the trial court's conclusion. However, pursuant to § 5327, the parties are not balanced evenly and, mindful of Father's adequate parenting capabilities, the lack of safety issues, and the dearth of evidence that the past practices of polyamory harmed the children, the certified record does not establish that Grandparents adduced clear and convincing evidence to rebut the statutory presumption and tip the scales in their favor. Thus, the trial court's decision to grant Grandparents sole legal custody and reduce Father's period of physical custody to two nonconsecutive days per month under the circumstances of this case is manifestly unreasonable. Therefore, it is tantamount to an abuse of discretion. *See C.R.F., supra* at 443 ("Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.").

Having found that the trial court abused its discretion in awarding Grandparents legal custody and primary physical custody of A.B. and Z.B., we also observe that the record is sufficiently developed to award custody to Father. *See M.A.T. v. G.S.T.,* 989 A.2d 11, 21 (Pa.Super.2010) (*en banc*) (collecting cases where this Court awarded

custody based upon the certified record.) In *M.A.T.* we observed, "In most cases in which we conclude that an abuse of discretion has occurred, the case is remanded to the trial court for further consideration. Where, however, the record is sufficiently developed ..., we may substitute our judgment for that of the trial court and decide the case on the merits." *Id.* Accordingly, we reverse the custody order entered on December 20, 2011, award Father legal custody and primary physical custody of A.B. and Z.B., and remand this case for the trial court to fashion a custody schedule that suits A.B.'s and Z.B.'s best interests and to direct Father, Stepmother, and Grandparents to attend compulsory counseling at their own expense in order to confront and alleviate the ongoing hostilities among them.[9]

■ Finally, we observe that Father's second issue is waived to the extent that he asserts that the trial court erred in failing to recuse itself from the custody proceedings. Simply stated, Father did not request the trial court to recuse itself from these proceedings after he discovered that it presided over Stepmother's unsuccessful custody litigation. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal").

■ However, Father preserved a related complaint that the trial court erred in taking judicial notice of Stepmother's prior custody proceedings because Father was not a party to that litigation and was not permitted to testify on Stepmother's behalf during that hearing. Father first leveled

this argument, albeit artlessly, when Grandparents sought to invoke the prior, unrelated custody proceeding at the outset of the December 12, 2011 hearing. *See* N.T., 12/13/11, at 7–8. Moreover, he arguably preserved the argument as an aspect of the position he asserted in the Rule 1925(b) statement that he filed concomitant with his notice of appeal. *See* Rule 1925(b) Statement, 1/9/12, at unnumbered page 2 ("At the time of [Stepmother's] non-jury trial hearing. [Father] was never afforded an opportunity to testify ... prior to the Court ending the hearing [prematurely] and making a ruling from the bench."). Accordingly, we will address the merits of this claim.

■ In issuing the custody order that is the genesis of this appeal, the trial court acknowledged that it took judicial notice of the entire "official file" in the prior, unrelated custody dispute, reviewed that file, and considered the information contained therein in fashioning the instant custody order. *See* Trial Court Order, 12/20/11, at 1. As noted, Father asserts the trial court erred in taking judicial notice of the facts adduced during the prior, unrelated proceeding. We agree.

■ Initially, we find no basis to disturb the court's decision to take judicial notice of the **fact** that it ruled against Stepmother in a prior custody dispute. *See* Pa.R.E. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready deter-

---

9. In entering the custody order awarding Father primary physical custody, the trial court is directed to reinstate Grandparents' periods of physical custody in accordance with the interim custody order entered on March 13, 2009, as modified on July 30, 2009. Following additional proceedings, the trial court may fashion a revised custody schedule that is consistent with this writing. Since the trial court previously awarded Mother two days of physical custody per month, in crafting a new custody arrangement, the trial court may grant Mother an appropriate measure of physical custody and direct that she participate in counseling along with Father, Stepmother, and Grandparents.

mination by resort to sources whose accuracy cannot reasonably be questioned[.]"). However, in contrast to merely taking judicial notice of its prior ruling, herein, the trial court committed reversible error by incorporating the entire file of the unrelated custody litigation into this matter by reference and by relying upon its prior findings of facts to reach its determination herein. *See 220 Partnership v. Philadelphia Elec. Co.*, 437 Pa.Super. 650, 650 A.2d 1094, 1097 (1994) ("Where material facts are in dispute, judicial notice may not be used to deny a party an opportunity to present contrary evidence").

In *Jones v. Jones*, 884 A.2d 915, 916–917 (Pa.Super.2005), this court stated that incorporating testimony from a prior custody hearing between the parties was "an intelligent and efficient way to proceed, particularly when the same trial judge presided over the prior hearings." However, since Father was not a party to the prior custody hearing and Stepmother is not a party in the case at bar, our holding in *Jones* is inapplicable.

Instantly, the trial court took judicial notice of the specific factual findings it formulated from the evidence adduced during the prior, unrelated case and then relied upon those findings of fact as a basis to issue the restrictive custody order it fashioned herein. Since Father did not have the opportunity to adduce any evidence to influence the trial court's fact-finding in the prior, unrelated custody dispute, it was patently prejudicial to hold him to those findings in the present case. The trial court's actions are particularly deleterious in this case because the trial court apparently issued its prior custody order against Stepmother from the bench without hearing her case-in-chief. N.T., 12/13/11, at 7. As the trial court relied upon specific adjudicative facts regarding Stepmother that stemmed from evidence adduced during the prior, unrelated custo-

dy dispute, the trial court committed legal error. *See 220 Partnership, supra.*

Moreover, as a practical matter, unlike cases as *Jones, supra*, which involve earlier custody hearings between the identical parties, the evidence underlying the trial court's prior factual findings are not included in the certified record on appeal in this case, and therefore, they do not exist for the purposes of our review. *In re J.F.*, 27 A.3d 1017, 1024 n. 10 (Pa.Super.2011) (quoting *Stumpf v. Nye*, 950 A.2d 1032, 1041 (Pa.Super.2008)); ("It is well-settled that this Court may only consider items which have been included in the certified record and those items which do not appear of record do not exist for appellate purposes.").

Order reversed. Case remanded for entry of a custody order consistent with this opinion and further proceedings. Jurisdiction relinquished.

Judge COLVILLE files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY COLVILLE, J.:

I agree with the Majority's conclusion that Appellant waived his issue regarding whether the trial court erred by failing to recuse itself from the custody proceedings. I also agree with the Majority to the extent that it concludes that a review of the trial court's order reveals that, in awarding custody to Grandparents, the court failed to apply the presumption found at 23 Pa. C.S.A. § 5327(b). In my view, this error should result in this Court vacating the trial court's order and remanding the matter to the trial court. I only would instruct the trial court to issue a custody order that complies with Subsection 5327(b).