J-S60043-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| N.F. N/K/A N.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| B.F. | : | |
| | : | |
| Appellee | : | No. 855 MDA 2018 |

Appeal from the Order Entered May 16, 2018
in the Court of Common Pleas of Huntingdon County
Civil Division at No(s):  2013-00148

BEFORE:   SHOGAN, J., NICHOLS, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:          **FILED NOVEMBER 30, 2018**

N.F. n/k/a N.H. (Mother) appeals from the order entered May 16, 2018, in the Court of Common Pleas of Huntingdon County, which awarded primary physical custody of her sons, G.F., born in June 2011, and C.J.F., born in July 2012 (collectively, Children) to their father, B.F. (Father).[1]  We affirm.

We summarize the relevant facts and procedural history of this case as follows.  Mother and Father are former spouses who married in August 2008.  Mother filed a complaint in divorce in January 2013, which included a count requesting custody of Children.  The parties agreed to a memorandum of understanding, entered as an order of court on April 2, 2013, pursuant to

_____

* Retired Senior Judge assigned to the Superior Court.

[1] C.J.F. is not Father's biological son.  Although C.J.F. was born during Mother's marriage to Father, and is therefore Father's child legally, the parties agree that he is the biological son of J.M., with whom Mother had an extramarital affair.

which Father received partial physical custody of Children each weekend. The memorandum provided that Father would have custody from 6:00 p.m. Friday until 5:30 p.m. Monday, except for the second weekend of each month, during which Father would have custody from 5:00 p.m. Sunday until 5:30 p.m. Monday.[2] The order did not address legal custody, but Father and Mother shared legal custody pursuant to a series of interim court orders entered prior to the memorandum of understanding. The trial court entered a divorce decree in October 2015.

On March 22, 2017, Mother filed a petition to modify custody. The trial court ordered the parties to mediation, where they entered into an additional memorandum of understanding making slight changes to the existing custody arrangement. The court entered the memorandum as an order of court on June 2, 2017.

Relevant to this appeal, Mother filed a second petition for modification of custody on March 2, 2018. Therein, she averred that C.J.F., who was five years old at the time, had disclosed being the victim of sexual abuse by his paternal cousin, C.M.F., who was twelve years old. She averred that

_____

[2] The order provided that the parties would share physical custody equally if Father was laid off or his work schedule changed such that he worked daylight hours. In that case, Father would have custody from 5:00 p.m. every other Sunday until 5:00 p.m. the following Wednesday. Immediately after that Wednesday, Father would have custody from 5:00 p.m. Friday until 5:00 p.m. Sunday. By the time of the hearing in this matter, the parties were operating on a shared physical custody schedule.

Children's paternal grandparents babysat them while Father was at work, and that the abuse occurred while Children were in the paternal grandparents' care. She requested that Father have custody only when he is not working and able to care for Children himself.[3]

The trial court conducted a hearing on Mother's petition on May 1, 2018. The court first heard the testimony of Mother. Mother focused her testimony on the aftermath of C.J.F.'s sexual abuse allegations. She criticized Father's response to the allegations, saying that he and his family do not believe C.J.F. N.T., 5/1/2018, at 16. She admitted that Children and Youth Services (CYS) deemed the allegations unfounded after an investigation but emphasized that an investigation by the State Police remains ongoing. *Id.* at 37.

Concerning her own response to C.J.F.'s allegations, Mother described an incident that took place following Children's baseball game the weekend prior to the hearing. The game occurred during Father's period of custody and Father's brothers, Mi.F., who is C.M.F.'s father, and Ma.F., were present. After the game, as the Children were playing in a nearby playground, Mother asked Father to tell Mi.F. to leave. *Id.* at 43. This sparked an argument during which Mother began yelling while Father loaded Children into his car. *Id.* at 44. Mother then followed Father's car for an unspecified distance and called

_____

[3] Mother also filed an emergency petition for special relief requesting that Children have no contact with their paternal grandparents pending an investigation of C.J.F.'s allegations. The trial court scheduled a hearing on Mother's petition but the record does not reveal the existence of an order granting or denying her requested relief.

the State Police, sending them to Father's home to ensure that Children were safe. *Id.* at 45.

Mother further testified that she created a post on Facebook warning that "people needed to keep their kid away from" C.M.F. *Id.* at 39. Mother claimed that her post was a "general comment," and did not provide identifying information for C.M.F. *Id*. at 43. However, when confronted with the text of the post on cross-examination, she admitted that she described C.M.F. as an "evil child" and did in fact provide his bus number, grade, and school. *Id.* at 52-53. Father's counsel also questioned Mother about a voicemail that C.J.F. left Father using Mother's phone, during which he stated that he did not want to visit Father anymore.[4] Mother claimed that Children know the password to her phone and that they have access to it "all the time." *Id.* at 69-70. She denied that she was present during the phone call or knew that it had taken place. *Id.* at 94-95. However, she insisted that C.J.F. demands frequently that he no longer visit Father. *Id.* at 95.

The trial court then heard the testimony of Father. Father's testimony focused on his belief that Mother filed her petition for modification of custody out of spite rather than concern for Children's safety. Father testified that he cooperated with Mother to address C.J.F.'s allegations by alerting CYS and Mi.F. *Id.* at 105-06. He also agreed that the Children should stay away from C.M.F. until the allegations were resolved. *Id.* at 108. However, he

---

[4] The voicemail was not included in the certified record but its contents are undisputed.

complained that Mother began using the allegations as an excuse to request that Children not spend time with him, their paternal grandparents, or C.M.F.'s parents. *Id.*

The trial court continued the custody hearing on May 15, 2018, during which it heard further testimony from Father. Father expressed concern that Mother may have caused C.J.F. to fabricate the allegations of sexual abuse. *Id.* at 22-23. He explained that Mother made statements to him indicating that she intended to take Children away and move in with her boyfriend in Maryland. *Id.* at 28-30.

Next, Mother presented the testimony of her boyfriend, M.S., and the Children's maternal step-grandfather, R.M., while Father presented testimony from Mi.F. and Children's paternal grandfather, F.F. Of significance here, Mi.F. provided further testimony concerning the incident at the playground following the Children's baseball game. Mi.F. recalled that Mother threatened C.M.F. during the incident, stating that C.M.F. "is gonna get what is coming to him," and "that it's going to be on the news." *Id.* at 80.

Finally, Mother testified on rebuttal. During cross-examination, Father's counsel asked Mother whether she made the statements described by Mi.F., that C.M.F. would "get what is coming to him" and that it would be on the news. *Id.* at 110. Mother denied that she made the statements. *Id.* Father's

counsel then confronted Mother with a video of the incident, recorded by Ma.F. on his phone, proving that she said what Mi.F. described.[5] *Id.* at 110-11.

After hearing the testimony, the trial court announced that it would award shared legal custody to both parties and award primary physical custody to Father. The court awarded partial physical custody to Mother each Wednesday from 4:00 p.m. until 8:00 p.m. and every other weekend from 4:00 p.m. Friday until 8:00 p.m. Sunday. The court entered an order memorializing this decision on May 16, 2018. Mother timely filed a notice of appeal on May 23, 2018, along with a concise statement of errors complained of on appeal. The court entered a supplemental order including a holiday schedule on May 29, 2018, and filed an opinion pursuant to Pa.R.A.P. 1925(a) on June 25, 2018.

Mother now raises the following claims for our review.

ISSUE I. Whether or not [the trial c]ourt erred in finding that the best interest of [C]hildren would best be served by granting primary custody to Father?

ISSUE II. Whether or not [the trial c]ourt erred by allowing testimony and the playing of a video and audio of [Mother] despite the fact that there was no testimony that said the video and audio was taped with consent of [Mother]?

ISSUE III. Whether or not [the trial c]ourt erred by making a finding after reviewing the file from [CYS] that this abuse did not occur?

---

[5] Mother's counsel objected to the playing of this video as being a violation of the Wiretap Act, 18 Pa.C.S. §§ 5701-5782. N.T., 5/15/2018, at 111. That objection was overruled.

ISSUE IV. Whether or not [the trial c]ourt erred by allowing questions to be asked about text messages that [Mother] denied ever making?

Mother's Brief at 4 (suggested answers omitted).

We consider Mother's claims mindful of our well-settled standard of review.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S. § 5328(a).

> **(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from

abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Here, in its analysis of these factors, the trial court concluded that subsections 5328(a)(1), (2), (4), (8), (9), (10), and (13) weighed in favor of Father, subsection 5328(a)(6) weighed in favor of Mother, and subsections 5328(a)(3), (5), (7), (11), (12), (14), and (15) were neutral. N.T., 5/15/2018, at 113-17. With respect to subsection 5328(a)(16), the court chastised Mother for her lack of candor and ordered that a transcript of the hearing be sent to the District Attorney's office due to her possible perjury. *Id.* at 112, 117. The court expressed that it could not determine whether C.M.F. had sexually abused C.J.F., or whether Mother had caused C.J.F. to fabricate the allegations. *Id.* at 117. However, it concluded that Mother was attempting to mentally condition the Children and turn them against Father. *Id.* at 113, 115. The court emphasized C.J.F.'s phone call to Father, stating, "[t]he fact that [Mother] had a five-year-old call [Father] and tell [Father] that [C.J.F.] did not want to go visit [Father] is outrageous. And I firmly believe, based on my judge of credibility, that [Mother] had [C.J.F.] do that." *Id.* at

115. It also expressed concern that Mother's life was unstable and that she was struggling to regulate her emotions. *Id.* at 114, 116.

On appeal, Mother's first claim is that the trial court erred by concluding that it would be in the Children's best interests to award primary physical custody to Father. Mother argues that the court was biased against her and challenges its factual findings with respect to subsections 5328(a)(1), (2), (4), (8), (9), (10), (13), and (14). Mother's Brief at 8, 12-20. Additionally, she argues that the court's findings lacked sufficient detail, such that it failed to consider all of the factors and delineate the reasons for its decision. *Id.* at 18-23.

After careful review, it is clear that the record supports the trial court's findings. There was no evidence presented during the hearing that Father allowed the Children to have any contact with C.M.F. after becoming aware of abuse allegations. Despite this, Mother engaged in unreasonable and spiteful behavior, which disrupted Father's custody of the Children and targeted his family. During the incident at the playground, Mother instigated an argument, followed Father's car, and then called the State Police simply because Mi.F. was present. Mother also identified C.M.F. and attacked him by name on Facebook. Mother's motives in taking these actions appear to have been less than sincere, as demonstrated by C.J.F.'s phone call to Father to say that he no longer wants to visit him. This Court's review of the record confirms the trial court's conclusions. Mother appears to have been dishonest with the trial

court at least twice, and it was well within the court's discretion to disregard much if not all of her testimony. *See V.B.*, 55 A.3d at 1197.

While Mother contends that the trial court failed to conduct an adequate analysis of the subsection 5328(a) factors, we disagree. Our review reveals that the court discussed all of the factors and explained its reasoning as to each in a clear and concise manner.[6] As this Court has stated, trial courts are not obligated to discuss the subsection 5328(a) factors in any specific amount of detail. Rather, "all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013). Mother's first claim merits no relief.

In her second claim, Mother argues that the trial court erred by allowing Father's counsel to play, and question her about, the video of the incident at the playground following Children's baseball game. Mother contends that the court erred because there was no testimony that Mother consented to the videotaping, making it a violation of Pennsylvania's Wiretap Act, 18 Pa.C.S. §§ 5701-5782. Mother's Brief at 8-9, 24-26. She asserts that the tape was inadmissible because the Wiretap Act prohibits the intentional use or disclosure of oral communications intercepted in violation of its provisions. *Id.* at 25-26 (citing 18 Pa.C.S. § 5703(2)).

---

[6] The trial court did not include a separate analysis of subsection 5328(a)(2.1), but it is clear that the court considered the parties' involvement with CYS.

Mother's challenge requires us to interpret the Act's statutory language. Thus, our standard of review is *de novo* and our scope of review is plenary. ***Bayview Loan Servicing, LLC v. Lindsay***, 185 A.3d 307, 311 (Pa. Super. 2018). When this Court interprets a statute, we do so mindful of the following principles.

> [O]ur objective is to ascertain and effectuate the intention of the General Assembly[,] and that [e]very statute shall be construed, if possible, to give effect to all of its provisions. This Court may not ignore the language of a statute, nor may we deem any language to be superfluous. Governing presumptions include that the General Assembly intended the entire statute at issue to be effective and certain, and that the General Assembly did not intend an absurd result.

***Id.*** at 312 (citations and quotation marks omitted).

In addition, to the extent this claim implicates the trial court's discretion in allowing the admission of evidence, our standard of review is as follows.

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

***Phillips v. Lock***, 86 A.3d 906, 920 (Pa. Super. 2014) (quoting ***Stumpf v. Nye***, 950 A.2d 1032, 1035–36 (Pa. Super. 2008), *appeal denied*, 962 A.2d 1198 (Pa. 2008)).

The Wiretap Act provides as follows, in relevant part.

Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:

> (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;

> (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or

> (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

18 Pa.C.S. § 5703.

As Mother contends, the Wiretap Act makes it a criminal offense for a person to disclose or use intentionally the contents of an oral communication when he or she knows or has reason to know the information was obtained through the interception of that communication. *See id.* In addition, with limited exception, the Wiretap Act provides that "no person shall disclose the contents of any wire, electronic or oral communication, or evidence derived therefrom, in any proceeding in any court, board or agency of this Commonwealth." 18 Pa.C.S. § 5721.1(a)(1). The Wiretap Act permits interception of oral communications "where all parties to the communication have given prior consent to such interception." 18 Pa.C.S. § 5704(4).

- 13 -

Further, of particular significance here, the Wiretap Act defines "oral communication" as "[a]ny oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation."  18 Pa.C.S. § 5702.

In the instant matter, we observe that there is at least some testimony suggesting that Mother consented to the videotaping of the incident at the playground.  Mother testified that she noticed M.F.2 begin to videotape her as the events unfolded.  N.T., 5/1/2018, at 44 ("As [Father] loaded the boys into the car …. His oldest [brother] started recording me on his phone…. I said, 'You're not helping him.  I don't want this for my kids.'").  However, she continued to escalate the incident and there is no indication in the record that she asked M.F.2 to stop.

Even if Mother did not consent to the videotaping, the trial court still did not commit legal error by allowing Father's counsel to play the tape and question Mother about its contents.  As we observed *supra*, the Wiretap Act applies to oral communications made when the speaker has "an expectation that such communication is not subject to interception under circumstances justifying such expectation."  18 Pa.C.S. § 5702; **see also Commonwealth v. Dewar**, 674 A.2d 714, 718 (Pa. Super. 1996) ("[T]he Act requires that the person uttering the words [has] a justifiable expectation that such words are not intercepted, using similar principles employed to determine whether the utterer had an expectation of privacy.").  Under the circumstances present

here, it is clear that Mother had no justifiable expectation that her statements were not subject to interception. Mother made her statements in or near a public playground and parking lot, with at least five other people, including Children, Father, and Father's brothers, present and listening to her. Nothing about this situation would suggest that Mother intended her statements to be private or that M.F.2 violated the Wiretap Act by recording them. No relief is due.[7]

Next, Mother argues that the trial court erred by making a finding that C.M.F. did not sexually abuse C.J.F. after reviewing the CYS file and C.J.F.'s interview at the Child Advocacy Center. Mother complains that the court made this finding "prior to the hearing" before it had the opportunity to hear the

_____

[7] We observe that the Wiretap Act defines "intercept," in part, as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa.C.S. § 5702. The Act exempts from its definition of "electronic, mechanical or other device" any telephone "furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business, or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business[.]" *Id.* Thus, at first glance, the Wiretap Act did not prohibit M.F.2 from recording Mother because he did so using his phone. We note, however, that the fact that M.F.2 recorded Mother using his phone's videotaping function excluded him from the Act's telephone exception. *See Commonwealth v. Smith*, 136 A.3d 170, 177 (Pa. Super. 2016) (concluding that the trial court erred when it ruled that the use of a smartphone's "voice memo" app did not constitute the use of a "device" under the Wiretap Act where the smartphone "was not being used, by any measure, as a telephone").

evidence.[8]  Mother's Brief at 27-30.  She admits that C.J.F. did not disclose any sexual abuse during his interview, but emphasizes that C.J.F. "also did not specifically state the abuse was made up….  [C.J.F.] did not confirm or deny the actions of [C.M.F.]." *Id.* at 28.

The record belies Mother's claim.  Before beginning the hearing, the trial court made the following statement regarding its review of the CYS file.

> THE COURT: We are here for a pre-trial conference.  I have the CYS file.  I have reviewed the CYS file.  I have also reviewed the [Child Advocacy Center] video in question, and I am going to return that to [CYS].  That will not be made part of this record.
>
> [Father's counsel]: The only thing that I would like to be made a part of this record is the unfounded letter.  I believe that would be appropriate.
>
> THE COURT: Well there is no question that I will make a note that it's unfounded, but there is no need to call anyone from [CYS].  I have reviewed their entire record, and I believe that based on the record, there is no way that [Mother's counsel] could prove what he was attempting to prove.  That's just -- it's a matter of proof, and the proof is not there.

N.T., 5/1/2018, at 4.

The trial court revisited this issue on two occasions during the hearing. At the conclusion of the first day of testimony, the court stated, "I have not

---

[8] As discussed *infra*, the record shows that the court specifically declined to make a finding during the hearing that the abuse did not occur. *See* N.T., 5/15/2018, at 117.  However, it later included such a finding in its opinion. *See* Trial Court Opinion, 6/25/2018, at 3 ("[I]n this case we reviewed the interview and determined that the abuse did not occur.  This Court heard absolutely no credible evidence regarding the allegations and to find otherwise would have been error").

made a finding as to what happened regarding C.J.F.'s abuse allegations. I have heard no evidence. There is no evidence whatsoever. And this is a court of law, and I make my decisions based on evidence." *Id.* at 133. Finally, at the conclusion of the second day of testimony, the court stated as follows.

> There is no evidence that the abuse of [C.J.F.] at the hands of a 12-year-old occurred. However, I find it as likely that this was put in [C.J.F.'s] head by [Mother]. And I can't make a finding that that happened just like I can't make a finding abuse happened.

N.T., 5/15/2018, at 117.

Thus, contrary to Mother's argument, the trial court did not make a finding regarding abuse prior to, or even during, the hearing. The court concluded that the parties would not be able to prove either way whether C.M.F. had abused C.J.F., or whether the allegations were part of a scheme by Mother to reduce Father's custody.

Moreover, it was not an abuse of discretion for the court to make this finding after the conclusion of the hearing. The court was free to weigh the evidence presented at the hearing and conclude that it did not demonstrate that C.M.F. abused C.J.F., and we must defer to the court's determination. *V.B.*, 55 A.3d at 1197. Even assuming for the sake of argument that the court did abuse its discretion, the record demonstrates that Mother suffered no prejudice, as the court awarded primary physical custody to Father even before reaching this conclusion. Mother is not entitled to relief.

In her final claim, Mother asserts that the trial court erred by allowing Father's counsel to question her about text messages that she denied sending. This claim derives from her cross-examination, during which Father's counsel presented her with copies of the messages containing insulting statements allegedly sent to Father. Mother contends that, after she denied sending the messages, "any questioning concerning said text messages should have stopped." Mother's Brief at 10. She also complains that the court held the messages against her, even though she denied sending them, which proves that it was biased against her. *Id.* at 31.

We discern no legal error. When Father's counsel presented Mother with copies of the relevant text messages, Mother stated that she sent some of the messages but not others. N.T., 5/1/2018, at 62. Father's counsel then went through several of the messages in an effort to discern which ones Mother admitted sending and which ones she denied sending. For example, Mother admitted threatening to kill Father if C.J.F. suffers any further abuse on his watch and telling him he does not "deserve to be a dad," but denied calling him a "scumbag" and saying that he would never see Children again. *Id.* at 67-68.

Accordingly, Father's counsel did not ask Mother about text messages she denied sending as Mother maintains. Mother denied sending only some of the messages, and Father's counsel questioned her to clarify which ones she admitted sending and which ones she denied sending. This procedure

was entirely proper. In addition, Father testified that the messages were not altered, deleted, or changed in any way, and were an accurate representation of his conversations with Mother. *Id.* at 130-31. The court was free to accept Father's testimony and its credibility determination in no way suggests bias against Mother.

Based on the foregoing, we conclude that the trial court did not commit an abuse of discretion or error of law by awarding primary physical custody of Children to Father. Therefore, we affirm the court's May 16, 2018 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2018