J-A07007-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M.P.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.N.G. | : | No. 1810 MDA 2017 |

Appeal from the Order Entered November 1, 2017
In the Court of Common Pleas of Berks County
Civil Division at No(s):  12-1397

BEFORE:   PANELLA, J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY PANELLA, J.                    **FILED APRIL 19, 2018**

M.P.K. ("Father") appeals from the order entered November 1, 2017,[1]

in the Court of Common Pleas of Berks County, which denied his petition for

_____

* Former Justice specially assigned to the Superior Court.

[1] Appellant's notice of appeal purports to appeal "from the order dated October 31, 2017." Notice of Appeal, filed 11/28/17. An order does not become appealable on a certain date simply because the trial court signs it on that date.

 "[N]o order of a court shall be appealable until it has been entered upon the appropriate docket in the lower court." Pa.R.A.P. 301(a)(1). The entry of an order and the specific date of entry is defined in Rule 108(b): "The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)." Pa.R.A.P. 108(b). Rule 236(b) requires that "[t]he prothonotary shall note in the docket the giving of the notice...." "Thus, pursuant to the express terms of the rules, an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." **_Frazier v. City of Philadelphia_**, 735 A.2d 113, 115 (Pa. 1999) (citations omitted). **_See also_** G. Ronald Darlington, et al., Pennsylvania Appellate Practice § 108:10,

modification of custody with respect to his minor son, N.T. ("Child"). We affirm.

Child was born to Father and J.N.G. ("Mother") in January 2012. Father and Mother never married or lived together. Currently, Father is married to D.K. ("Stepmother"). Father and Stepmother have two biological children together, M.K., born in February 2013, and H.K., born in October 2014. Mother is married to J.C.G., III ("Stepfather"), although they are separated. Mother and Stepfather have one biological child together, H.G., born in August 2015. Mother has an adult child from a prior relationship, T.B., who lives independently. Stepfather also has a child from a prior relationship, J.G., born in January 2009. J.G. lives primarily with his paternal grandparents, but continues to spend time with Mother.

Father and Mother exercise custody of Child pursuant to an agreed-upon custody order entered April 2, 2013.[2] The order awards primary physical custody of Child to Mother and awards partial physical custody to Father according to a two-week rotating schedule. In week one, the order awards

_____

Volume 20 (2016–2017 ed.). "[T]his is a bright-line rule, to be interpreted strictly." **In re L.M.**, 923 A.2d 505, 509 (Pa. Super. 2007).

Here, while the trial court signed the order on October 31, the lower court prothonotary entered the order on the docket, with the appropriate notation, on November 1. We have corrected the appeals statement of the caption accordingly.

[2] The trial court made minor modifications to the April 2, 2013 order by orders entered September 10, 2013, and August 28, 2014. These modifications did not affect the parents' custody schedule.

Father partial physical custody from 6:00 p.m. on Friday until 6:00 p.m. on Tuesday. In week two, the order awards Father partial physical custody from 6:00 p.m. on Saturday until 6:00 p.m. on Tuesday. The order also awards shared legal custody to both parents.

On March 9, 2017, Father filed a petition for modification of custody, in which he requested primary physical custody of Child. On June 19, 2017, Mother filed a combined answer, counter-petition for modification of custody, and petition for contempt. Therein, Mother requested that the trial court reduce Father's periods of partial physical custody, and award her sole legal custody regarding medical and educational decisions. Mother also alleged that Father was in contempt of the prior custody order, for making derogatory remarks about her and Stepfather, and for interfering with her ability to speak with Child on the phone.

The trial court conducted a hearing on September 29, 2017, and October 26, 2017. Following the hearing, by order entered November 1, 2017, the court directed that the parents would continue to exercise custody of Child pursuant to the April 2, 2013 order. The court also added several new custody provisions. Relevant to this appeal, the order directed that Child would attend the Exeter Township School District, and that Father and Stepmother "shall not permit the Minor Child to touch any cat at any time" due to his cat allergy.[3]

_____

[3] The order did not address Mother's contempt allegations.

Order, 11/1/17. Father timely filed a notice of appeal on November 22, 2017.

Father filed a concise statement of errors complained of on appeal on

December 6, 2017.[4]

> Father now raises the following issues for our review.
>
> I. Did the trial court err when it failed to provide appropriate weight to the individual custody factors enumerated in 23 Pa.C.S.A. §[]5328 in issuing its October 31, 2017 decision and order?
>
> II. Did the trial court err when it failed to consider the best interests of the child and instead punished Appellant/Father for filing a petition to modify custody?
>
> III. Did the trial court err when it ordered the minor child to attend the Exeter School District?
>
> IV. Did the trial court err when it ordered that Appellant/Father and Stepmother shall not permit the minor child to touch any cat at any time when there was no expert medical testimony provided to establish any allergy of the minor child to animals?

Father's Brief, at 3 (unnecessary capitalization and suggested answers

omitted).

We consider Father's issues mindful of our well-settled standard of

review.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of

---

[4] Father violated Pa.R.A.P. 1925(a)(2)(i) by failing to file a concise statement at the same time as his notice of appeal. We have accepted Father's concise statement pursuant to *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that the appellant's failure to comply strictly with Pa.R.A.P. 1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party).

J-A07007-18

record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). The factors to be considered by a court when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a).

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

- 5 -

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In its opinion, the trial court analyzed each of the § 5328(a) factors.[5] The court found that subsections (1), (3), (9), (10), and (13) weighed in favor of Mother, while (4), and (5) weighed in favor of Father. **See** Trial Court Opinion, 10/31/17, at 10-17. In addition, the court found that subsections (2), (6), (8), (11), (12), and (14) weighed in favor of neither party, and that subsections (7), and (15) were irrelevant. **See id**., at 10 n.1, 11-13, 15-17.

During its discussion of the § 5328(a) factors, the trial court placed particular emphasis on Father's tendency to delegate his co-parenting responsibilities to Stepmother, and his resistance to communicating and cooperating with Mother. The court's findings with respect to subsection (a)(1) are illustrative of these concerns.

> The first relevant factor concerns "which party is more likely to encourage and permit frequent and continuing contact between the child and another party." At the first trial, both parties' conduct limited their capacities to encourage such contact. At the present time, some issues remain. Mother's conduct, however, has improved. While she still sends texts that can be deemed excessive, they are not as extensive as previously. Her micromanaging continues, but to a lesser extent, and she does not appear to be nearly as overprotective of the Minor Child as she was at the first trial. She has made attempts to reach out to Father, which Father and his wife deem insincere, but whether based on genuine motives or not, at least show an effort.

> Father continues to want to have as little contact with Mother as possible. As was the case at the first trial, it appears his primary purpose in filing a Petition to Modify is to limit his interaction with Mother. He has either delegated, or his wife has

---

[5] The trial court did not separately address subsection (a)(2.1). However, there was no evidence presented during the custody hearing which related to this factor.

assumed, the duty [of] responding to e-mails. Father does not appear to understand that if he wants to truly fulfill his duties as a father, that he must stand up and deal with Mother in an adult manner. He cannot pass off those duties to his wife or ask the Court to relieve him of his problem. Co-parenting is not optional, it is mandatory. While the [c]ourt recognizes that Mother can be hard to deal with, she is the Mother, and Father must make the effort. This factor favors Mother.

Trial Court Opinion, 10/31/17, 10-11.

In his first issue, Father presents myriad challenges to the trial court's factual findings. *See* Father's Brief, at 15-25. Father contends that the court should have reached different conclusions regarding the § 5328(a) factors. *See id*., at 16-25. Father further argues that the court placed an inordinate amount of weight on the parents' interpersonal difficulties, and that the court should have placed greater weight on his stability, availability, and extended family. *See id*., at 24-25.

After a careful review of the record in this matter, we conclude that the trial court did not abuse its discretion. During the custody hearing, Mother testified at length concerning Father's tendency to delegate his co-parenting responsibilities to Stepmother. For example, Mother presented the court with copies of her e-mails to Father. *See* Exhibit 12E.  During one exchange of e-mails, Mother sent a message to Father insisting that all contact regarding Child "is to be between you and I." *Id*. Stepmother responded to the e-mail, saying, "Actually, [Mother], [Father] doesn't need to talk to you at all in person. All communication is to be done via email." *Id*.

On another occasion, Mother testified that Stepmother called and informed her that she did not want Child to attend a particular preschool. *See* N.T., Hearing, 9/29/17 and 10/26/17 Vol. II, at 309-310. Mother recalled, "[Stepmother] expressed to me that she wanted [Child] to attend school with [his half-sister, M.K.] . . . . And I just thought that the conversation was something that should have been between [Father] and I, and I thought it was highly inappropriate . . . ." *Id*., at 310.

Finally, Mother testified that Father has refused to speak to her during custody exchanges, and left Stepmother to communicate on his behalf. Mother explained,

> . . . . During exchanges of [Child] . . . it would be [Father] and [Stepmother] during exchanges, and this is me picking up [Child] from their house. He would often walk away from the door and allow [Stepmother] to speak for him. And I did try and speak to him about that. I would say more recently it's gotten better, that really doesn't happen more recently.

*Id*., at 311.

In addition to delegating his co-parenting responsibilities, Mother testified that Father is often nonresponsive. *See id*., at 312. Mother testified that she recently attempted to schedule phone calls with Child on Sundays during Father's custody time; however, Father ignored Mother's requests. *See id*. Once again, Mother presented the court with copies of her e-mails to Father. *See* Exhibit 1D. The exhibit reveals that Mother sent six e-mails to Father requesting Sunday phone calls between November 29, 2016, and January 15, 2017, before Father finally responded. *See id*.

Thus, the record supports the trial court's finding that Father delegates his co-parenting responsibilities to Stepmother, and that he is resistant to communicating and cooperating with Mother. Mother makes an effort to co-parent with Father and improve their relationship—but Father rejects these efforts and sometimes ignores her. While Father contends that the court should have placed less emphasis on the parents' interpersonal difficulties, and emphasized other considerations instead, we must defer to the court's weight determinations. Because the court's conclusions were reasonable as shown by evidence of record, we discern no abuse of discretion.

In his second issue, Father argues that the trial court based its decision not on Child's best interest, but on a desire to punish Father for filing a petition for modification of custody. *See* Father's Brief, at 25-28. Father contends that the court made statements in its opinion indicating that it was displeased with Father for filing the petition. *See id*., at 26. Specifically, Father directs our attention to court's statements that "The matter before this court is the second petition to modify with the trial court," and that "Father is now, once again, seeking primary physical custody." *Id*. (quoting Trial Court Opinion, 10/31/17, at 4). Father's claim fails.

For the reasons already discussed, it is clear that the trial court considered Child's best interest when reaching its custody decision. The record supports the court's findings, and its conclusions were reasonable. And our review of the court's opinion does not reveal any statements indicating that it intended to punish Father. The statements relied upon by Father are

- 10 -

descriptions of the procedural history and posture of this case, and do not suggest any improper motive by the court.

In his third issue, Father argues that the trial court erred when it ordered that Child would attend the Exeter Township School District, where Mother resides. *See* Father's Brief, at 28-32. Father maintains, once again, that the court based this decision not on Child's best interest, but on a desire to "punish Father for a perceived lack of communication and failure to co-parent . . . ." *Id*., at 29-30. Father further contends that Mother's housing situation is unstable, because she lives in a home owned by Stepfather's parents, and may have to move to a different school district if she and Stepfather are unable to reconcile their marriage. *See id*., 30-32.

The trial court addressed Child's school district after concluding its discussion of the § 5328(a) factors.

> Regarding the school district, the continuation of the same schedule means that the Minor Child would be eligible to attend either the Exeter or Governor Mifflin School District. Both parties agree that either school would provide a fine education for the Minor Child. The fact that the Minor Child may be attending one school district with one set of siblings or the other school district with the other set of siblings does not factor in, the Minor Child having an excellent relationship with all of his siblings. This [c]ourt chooses Exeter School District for the sole reason that this court cannot trust Father to co-parent with Mother on a 50/50 basis. Because of that, this [c]ourt prefers that Mother's school district, Exeter, be the school district where the Minor Child matriculates, forcing Father, if he intends to be involved in the Minor Child's educational experience, to be involved with legal custody, activities, meetings with the teachers and administration, and all other aspects of the educational experience in a shared manner with Mother, not avoiding her whenever he can.

Trial Court Opinion, 10/31/17, at 18-19.

Father is not entitled to relief. As noted, the record supports the trial court's finding that Father refuses to co-parent. It was reasonable for the trial court to conclude that Child should attend school in Mother's school district, so that Father must learn to communicate and cooperate. While Father suggests that Mother may need to move to a different school district at some unknown time in the future, this argument is mere speculation, and does not warrant reversal of the court's order.

In his fourth and final issue, Father argues that the trial court erred when it ordered that Father and Stepmother shall not permit Child to touch any cat at any time. **See** Father's Brief, at 33-35. Father contends that Mother failed to present expert testimony to prove the severity of Child's cat allergy, and that the court's order was unreasonable. **See id**.

The trial court addressed Child's cat allergy during its discussion of § 5328(a)(10).

> The only issue relating to the physical needs of the Minor Child concerns the cat allergy. As there was no medical testimony, this [c]ourt cannot properly determine whether the Minor Child must be kept separate from the cats. If there are open wounds as Mother suggests, then Father should take additional steps to ensure the Minor Child's well-being. Why would any parent want his child to be uncomfortable, itching and scratching, because of an allergy that can be properly addressed? Without medical testimony, this [c]ourt cannot prohibit Father from having a cat, but will Order that Father and his wife shall ensure that the Minor Child is not permitted to touch the cat at any time. This factor favors Mother but only slightly.

Trial Court Opinion, 10/31/17, at 15.

Once again, our review of the record supports the trial court's findings. Mother testified that Child suffers from a cat allergy, which results in a rash. *See* N.T., Hearing, 9/29/17 and 10/26/17 Vol. II, at 340. She believed that Father and Stepmother continue to allow Child to touch their cat, despite this allergy. *See id*., at 341. She described one incident during which Child went to school during Father's custody time, and had "cat hair all over his shirt." *Id*., at 343. Child developed a rash "all the way up to his armpit. . . . Down his legs, his back, his chest, his face." *Id*., at 344-47. Mother expressed concern that Child's rash "itches him so much to the point where he is scratching his skin open and he is now at risk for infection when he has these open skin wounds." *Id*., at 347.

Stepmother acknowledged that Child suffers from a cat allergy. And that his being around the cat results in "puffiness around the eyes and little dots. . . . Usually around the neck and the creases of his elbows." N.T., Hearing, 9/29/17 and 10/26/17 Vol. I, at 185. Child's last "bad reaction" resulted in "[v]isible bumps and itchiness." *Id.* at 190. Stepmother testified that she and Father restrict Child's contact with their cat in order to manage his allergy. *Id*., at 185. She explained, "[Child] doesn't touch [the cat]. She doesn't go upstairs. His door stays closed. We vacuum, dust and he takes Zyrtec." *Id*. Stepmother testified that she allowed Child to touch the cat only once and required that he wash his hands afterward. *Id*.

Similarly, Father acknowledged that Child has a cat allergy. But he testified that it is "controllable and minor." *Id*., at 201-202. Concerning the

incident at Child's school, Father testified that Child suffered an allergic reaction "because he came in direct contact with cat hair." *Id*., at 261. Father explained that Child "sat somewhere the cat had been sitting on and got hair on him. We didn't know it by the time he left for school and it was an unfortunate day. But it made us aware that we need to take more closer observation on him . . . ." *Id*., at 203.

In light of this testimony, the trial court did not abuse its discretion. It is undisputed that Child suffers from a cat allergy, which results in a rash. The symptoms of this rash include puffiness around Child's eyes, bumps on his skin, and itchiness. It is clear that permitting Child to touch Father and Stepmother's cat is contrary to his best interest, because it places him at risk for further allergic reactions. Moreover, Stepmother testified that she and Father already prevent Child from touching their cat. By ordering Father and Stepmother not to allow Child to touch any cat at any time, the court was merely ordering them to continue doing what they already do.

Based on the foregoing, we conclude that Father's claims do not entitle him to relief. Therefore, we affirm the trial court's November 1, 2017 order.

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/19/18

- 14 -