J-S21001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| A.M.A. | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| O.H.F. | : | No. 2695 EDA 2018 |

Appeal from the Order Entered August 23, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No: DR#0C1412022

BEFORE:  STABILE, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 15, 2019**

A.M.A. ("Mother") appeals from the order entered August 23, 2018, which granted the proposed relocation of O.H.F. ("Father"), denied Mother's petition for contempt, and modified the prior custody award with respect to the parties' children, J.F., a female born November 2007, T.F., a female born June 2009, and H.F., a male born April 2012 (collectively, "the Children"). After careful review, we affirm.

We summarize the relevant factual and procedural history of this matter as follows.  Mother and Father married in 2006.[1]  N.T. Hearing, 8/17/18, at 10.  From the start, their relationship appears to have been rife with hostility. Mother and Father separated in 2008 and reunited four months later.  *Id.* at 101.  They separated again in 2014 and reunited in 2015.  *Id.* at 101, 160-

_____

[1] Father testified that he and Mother "got divorced recently.  I received the paper divorce, [*sic*] like, a few days ago[.]"  N.T. Hearing, 8/17/18, at 16.

61. This time, their reconciliation lasted only a week. *Id.* at 161. Meanwhile, the parties commenced custody proceedings, resulting in a final custody order entered on December 11, 2015. The order awarded shared legal custody to both parties, primary physical custody to Mother, and partial physical custody to Father every Sunday from 9:00 a.m. until 7:00 p.m., and every Tuesday from 3:00 p.m. until 6:00 p.m.

In April 2017, Mother and Father reunited once again. *Id.* at 159. In October 2017, an incident took place that resulted in their final separation. The details of this incident are the subject of significant disagreement. Mother claims that the Children's paternal grandmother attacked her and injured her right eye. *Id.* at 103. Father then kicked Mother out of the marital home and changed the locks. *Id.* at 103, 107. While Father's description of these events is somewhat unclear, he appears to claim that Mother left the marital home on her own, forcing him to care for the Children without her assistance.[2] *Id.* at 78-80. The trial court docket indicates that Mother, acting *pro se*, filed petitions for modification of custody and for contempt on October 5, 2017,[3] requesting partial physical custody and averring that Father was preventing

_____

[2] Mother later obtained a final Protection From Abuse ("PFA") order against Father after he failed to appear at a hearing. N.T. Hearing, 8/17/18, at 11-13. Father claims that he did not receive notice of the hearing. *Id.*

[3] These pleadings do not appear in the certified record.

- 2 -

her from seeing the Children.[4] Later that same month, Father left Philadelphia and moved with the Children to Columbus, Ohio.

Following a hearing on March 23, 2018, the custody master issued a proposed order, which provided that the parents would share legal custody, that Father would exercise primary physical custody, and that Mother would exercise partial physical custody during the last weekend of each month from Friday at 8:00 p.m. until Sunday at 4:00 p.m. The master's proposed order also provided that Mother would exercise custody for one week each month during the summer. Father, acting *pro se*, filed exceptions on April 16, 2018, averring that he was unable to care for the Children by himself. He further averred that he left Pennsylvania because Mother had threatened him and his life was in danger. On April 20, 2018, the trial court entered an order finding Father in contempt for unspecified reasons[5] and fining him $500. The court also modified the custody award, directing that Mother would have telephone contact with the Children every Sunday at 2:00 p.m., and every Wednesday and Friday at 8:00 a.m.

---

[4] The docket also indicates that Mother, acting through counsel, filed a motion for expedited relief on January 22, 2018. The trial court granted the motion by order entered April 6, 2018. Neither the motion, nor the order granting it, appears in the certified record. Mother resumed proceeding *pro se* after this filing.

[5] The trial court explained merely that Father "by his own testimony is not following the order of the court." Order, 4/20/18.

The trial court docket indicates that Mother filed another petition for contempt on May 11, 2018.[6] On June 7, 2018, the court entered an order finding Father in contempt for failing to attend the hearing that day in person and for his "willful failure to comply with the court order" in an unspecified manner. Order, 6/7/18, at 1. The order also directed that Father file a notice of proposed relocation to Ohio, and awarded Mother makeup time with the Children from June 10, 2018, until June 17, 2018. The following day, on June 8, 2018, the court entered an order directing that the Philadelphia Department of Human Services contact the appropriate child protective services agency in Ohio and request a safety assessment of Father's home.[7]

Father complied with the trial court's order by filing a notice of proposed relocation on June 11, 2018, averring that there was nowhere else for the Children to live. That same day, Mother filed a counter-affidavit indicating she had no objection to Father's relocation. In addition, Mother filed a custody stipulation, signed by both parties, averring that she permitted Father to take the Children back to Ohio before she had completed her makeup time on June 17, 2018, due to an emergency at her brother's residence that prevented the Children from staying in Pennsylvania. Curiously, Mother then filed a counter-

---

[6] Once again, this document is absent from the certified record.

[7] The certified record contains a copy of a report prepared by Franklin County Children Service in Ohio, dated June 9, 2018. The report states that Father's home was appropriate and that the agency had no concerns.

affidavit opposing the relocation on June 12, 2018. On July 9, 2018, Mother filed an additional petition for contempt, in which she alleged that Father was not allowing her to have contact with the Children, that he lied in his notice of proposed relocation by averring that no prior custody order was in place, and that he coerced Mother into agreeing to his relocation. She also filed a petition for expedited relief, requesting that the Children return to Philadelphia so that she could exercise custody twice per week.

The trial court conducted a hearing on August 17, 2018, during which both parties appeared represented by counsel.[8] The purpose of the hearing was for the court to address Father's proposed relocation, Father's exceptions to the proposed order, Mother's petition for contempt, and Mother's petition for expedited relief. Initially, the court heard testimony from Father. Father focused his testimony on alleged safety threats he faced in Philadelphia, the circumstances that caused Mother's June 2018 makeup time to end early, and his efforts to encourage the Children to maintain phone contact with Mother while in Ohio.

Father testified that, at or near the time of the parties' final separation in October 2017, Mother sent her brothers and other "strangers" to harm him. *Id.* at 15, 58. Specifically, Father recounted incidents during which his alleged tormentors removed the tires from his car and put it on blocks, "shot" his car,

---

[8] Mother remains represented on appeal. Father is before this Court *pro se*. He has not filed a brief.

and chased him in front of the pizza shop where he worked. *Id.* at 15-16, 58, 78. Father testified that he was afraid for his safety and needed assistance caring for the Children, so he moved to Ohio where his brother and sister-in-law lived. *Id.* at 15, 17, 77. Notably, Father's sister-in-law is also Mother's sister. *Id.* at 20. Father insisted that he and his attorney at the time informed Mother in advance that he intended to move, and that he only left pursuant to his attorney's advice after Mother failed to respond. *Id.* at 13, 56.

Concerning Mother's makeup time, Father testified that he brought the Children to Philadelphia as the trial court directed on June 10, 2018. *Id.* at 27-28. When he arrived, Mother informed him that her brother forced her to leave his home, "because she caused them a lot of trouble too," and that she had no place to go with the Children. *Id.* at 33. At Mother's suggestion, Father obtained a hotel room for Mother, the Children, and himself. *Id.* That evening, Mother agreed to sign paperwork so that he could return to Ohio with the Children early. *Id.* After Mother signed the paperwork, Father returned to Ohio with the Children, only to receive her objection to the relocation a few days later. *Id.* at 34. Mother stated to Father that she would travel to Ohio on June 17, 2018, but never did so. *Id.* at 32.

Finally, Father testified that he did not attempt to prevent the Children from having a relationship with Mother. *Id.* at 26, 74, 76. He explained that the Children are sometimes resistant to speaking with Mother and want to ignore her phone calls, but that he encourages them to answer. *Id.* at 26.

He admitted Mother might not have been able to speak with the Children for approximately a month because he missed a payment on his phone bill. *Id.* Father reported that Mother last contacted him a few weeks ago and told the Children she was terminally ill with the flu, and that she would never be calling them again. *Id.* at 38.

The trial court also heard the testimony of Mother. Mother testified that she left the marital residence in October 2017 after the Children's paternal grandmother attacked her.[9] *Id.* at 103. She then attempted to return to the marital residence, but was unable to do so because Father changed the locks. *Id.* at 107. Mother characterized Father as abusive, alleging that he struck her on multiple occasions, and that she obtained prior PFA orders against him in 2008, 2014, and possibly 2011. *Id.* at 101, 159-63, 210-11. Mother also alleged that Father accosted her in the hallway during the custody hearing and called her a "whore" in the Children's presence. *Id.* at 204.

Mother further testified that she resides with her brother, his wife, and their children. *Id.* at 135. Concerning her makeup time in June 2018, Mother testified that her brother was going to allow her and the Children to stay with him for only two days, while her sister was going to allow her and the Children to stay with her for only a day. *Id.* at 193. Mother planned to spend the rest

---

[9] The trial court received additional testimony from the police officer who interacted with Mother and prepared a report following the alleged attack. N.T., 8/17/18, at 86-99.

of her makeup time with the Children at a motel. *Id.* at 194. However, a pipe burst at her brother's home, which prevented her from staying there at all. *Id.* at 131, 194. Mother could not afford to house the Children at a motel for nearly the entire week, so she had to return them to Father earlier than expected. *Id.* at 134. She claimed that she signed the consent to Father's relocation by mistake, thinking that she was consenting only to the Children's early return to Ohio. *Id.* at 136-37. She conceded that she does not have enough space for the Children at her current residence and cannot afford a larger residence. *Id.* at 139, 199-201. Instead, she proposed that the trial court should order Father to return to Philadelphia so that she can spend more time with the Children. *Id.* at 140-41.

As for Mother's lack of contact with the Children, she blamed this on Father. Mother insisted that Father does not allow the Children to talk to her and that he has turned them against her. *Id.* at 103, 113-14, 126-30, 143. According to Mother, Father blocked her phone number and did not respond to her e-mails. *Id.* at 126-30. She reported that she last attempted to call the Children "a couple weeks" prior to the hearing, and that J.F. picked up the phone, told her not to call again, and hung up. *Id.* at 215. Mother conceded that she called the Children and expressed concern that she may be dying. *Id.* at 172-73. She explained that she was in the hospital with a "deadly" flu, and that she asked the Children to speak with her because it might be their last opportunity to do so. *Id.* Mother also described an incident during which

she flew to Ohio and attempted to visit the Children at their school, but was unable to do so because they were not in school that day. *Id.* at 150-51. Mother insisted that Father took the Children out of school to prevent her from seeing them. *Id.* at 151.

At the conclusion of the testimony, the trial court conducted *in camera* interviews of each of the Children separately. J.F. stated during her interview that her home in Ohio is "perfect," although she does miss Philadelphia. N.T. Interview, 8/17/18, at 11. Regarding her relationship with Mother, J.F. stated that she would be willing to spend time with Mother, although she would not enjoy it, and described Mother as "violent." *Id.* at 24. She expressed dislike for driving to Philadelphia frequently and suggested that Mother could drive to Ohio since her sister lives there. *Id.* at 6, 60. Significantly, J.F. provided the court with a detailed description of the events surrounding the parties' separation and the relocation to Ohio. J.F.'s description generally supported Father's testimony.[10]

---

[10] J.F. recalled that Mother became very upset in October 2017 after Father described her using "a bad word" and insisted that she make him some coffee. N.T. Interview, 8/17/18, at 29. Mother began cursing and spitting on Father, and flipped a table onto the paternal grandmother. *Id.* at 30-32. Regarding Mother's injury, J.F. suspected that Mother scratched her own eye accidently while the paternal grandmother attempted to hold her back, since Mother had long fingernails and the paternal grandmother did not. *Id.* at 32-34.

J.F. further recounted that Mother returned home the next day, went inside, and began collecting her belongings in a trash bag. *Id.* at 34-36. She then gave the Children ice cream and departed through the back door. *Id.* at

In addition, T.F. stated that she does not miss Philadelphia and would prefer to remain in Ohio. *Id.* at 73-76. T.F. indicated that she does not miss Mother and does not want to see her more often. *Id.* at 76-77. H.F. stated that he is not happy and wants to spend an equal amount of time with both of his parents. *Id.* at 80, 83. He described Mother in a less positive light than Father, explaining, "[s]he hits us. My dad doesn't. He just talks to us." *Id.* at 81.

Following the hearing, on August 23, 2018, the trial court entered the order complained of on appeal, granting Father's proposed relocation, denying Mother's petition for contempt, and modifying the previous custody award. Specifically, the court awarded shared legal custody to both parties, awarded primary physical custody to Father, and awarded partial physical custody to Mother every other weekend, from Friday at 7:00 p.m. until Sunday at 7:00 p.m., in Ohio.[11] The court attached to its order a thorough analysis of the factors set forth at 23 Pa.C.S.A. §§ 5328(a) and 5337(h), in which it credited

---

38-39. The day following Mother's departure, the family awoke to find both of their cars damaged. *Id.* at 42. J.F. reported that the windshield of one of the cars had "a hole right in the middle" resembling "a gunshot," while the other car was dented and had flat tires. *Id.* at 42-43. During approximately the following evening, J.F. described observing two men with flashlights "just flashing in our house." *Id.* at 52-55. Father called the police, who suggested that he should live somewhere else, resulting in the family's relocation to Ohio. *Id.* at 55-56.

[11] The trial court also awarded Mother weekly phone contact with the Children.

Father's testimony that he relocated to Ohio out of concern for his own safety. Order, 8/23/18, at 1-2, 7. In addition, the court credited Father's testimony that Mother abandoned the Children and thereby acquiesced to his relocation. *Id.* at 1-2, 4. The court found that it would be unrealistic for Father to drive from Ohio back to Philadelphia to facilitate Mother's custody of the Children, because it would make it difficult for him to maintain his job, but that Mother "does not seem averse to travel" and could use her sister's residence as a neutral location for custody exchanges.[12] *Id.* at 3, 5, 7, 12. In addition, the court observed that Mother did not request primary physical custody of the Children, and that she was not capable of exercising primary physical custody even if she had requested it, given that she lacked appropriate housing. *Id.* at 4-7, 10-13. The court placed particular emphasis on the preference of the Children, whom the court characterized as "brilliant human beings and mature beyond their years" to continue residing with Father. *Id.* at 2-4, 8, 10-13. Regarding Mother's request for contempt, the court explained that it found no credible evidence that Father was at fault for the lack of contact between the Children and Mother. *Id.* at 4, 6, 8-9. Instead, the court found that Father directed the Children to answer Mother's phone calls when they failed to do so. *Id.*

---

[12] Mother asserts in her brief that her sister left Ohio "recently" and returned to Pennsylvania after separating from Father's brother. Mother's Brief at 9.

Mother timely filed a notice of appeal on September 18, 2018, along with a concise statement of errors complained of on appeal. Mother also filed a motion for reconsideration on September 21, 2018, which the trial court did not address.

Mother now raises the following claims for our review:

a. Did the trial court commit legal error by conferring a presumption in favor of relocation when Father relocated the Children prior to the hearing?

b. Did the trial court commit legal error by improperly shifting the burden of proof to Mother when Father had the burden of establishing that relocation would serve the best interests of the Children?

c. Did the trial court commit legal error in failing to consider Father's failure to provide reasonable notice of a proposed relocation?

d. Did the trial court abuse its discretion by its finding that various custody and relocation factors favored Father against the weight of the evidence of record?

e. Did the trial [court] abuse its discretion by failing to find Father in contempt against the weight of the evidence of record?

Mother's Brief at 8 (unnecessary capitalization omitted) (suggested answers omitted).

Our standard of review in child custody cases is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or

- 12 -

inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). The factors that trial courts must analyze when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a):

> **(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> >
> > (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> >
> > (3) The parental duties performed by each party on behalf of the child.
> >
> > (4) The need for stability and continuity in the child's education, family life and community life.
> >
> > (5) The availability of extended family.
> >
> > (6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In addition, the factors that trial courts must analyze when considering a request to relocate are set forth at 23 Pa.C.S.A. § 5337(h):

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

In her first claim, Mother contends that the trial court erred by applying a presumption favoring Father's relocation to Ohio. Mother's Brief at 28-31. In her interrelated second claim, she contends that the court erred by placing the burden of proof on her, rather than Father. *Id.* at 28, 31-32. Mother maintains that it was Father's burden to prove that relocation would be in the Children's best interests, but that the court instead forced her to prove that relocation would be contrary to the Children's best interests. *Id.*

As Mother contends, our child custody statute provides that the burden of proof in relocation matters is on the party requesting relocation, and that a trial court should not presume that a relocation is in a child's best interests merely because it has already occurred. The statute provides as follows:

**(i) Burden of proof.--**

(1) The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in subsection (h).

(2) Each party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation.

\*\*\*

**(l) Effect of relocation prior to hearing.--**If a party relocates with the child prior to a full expedited hearing, the court shall not confer any presumption in favor of the relocation.

23 Pa.C.S.A. § 5337(i), (l).

However, our review of the trial court's opinion confirms that it did not commit either of the errors that Mother alleges. The court responded to these claims in its opinion as follows:

> We conducted the relocation hearing in accordance with the relocation and custody statutes. As the party proposing relocation, Father presented evidence as to why the relocation was in the best interests of the [C]hildren. Mother, through counsel, tested Father's evidence through cross-examination. Mother was then allowed to present additional evidence as to why relocation was against the best interests of the Children.

> We did not default to Columbus, Ohio as to where the Children should reside because Father had already relocated there. There was no presumption in favor of relocation or of Father having primary custody; [] Father adduced evidence that, among other things, he is now providing [the] Children with the continuity and stability they need, after moving to Ohio in response to the tumultuous events in Philadelphia in October 2017. Nor did we impose the burden of proof on Mother who was opposing relocation. This Court properly placed the burden of proof on Father and found that he carried his burden. . . .

Trial Court Opinion, 10/15/18, at 12.

The record supports the trial court's explanation. The court was free to base its decision in part on the fact that the Children were doing well in Ohio. Considering the benefits that living in Ohio has conferred on the Children thus far is not tantamount to shifting the burden of proof onto Mother or applying a presumption in favor of relocation. In fact, it would be error for the court not to consider this information. *See B.K.M. v. J.A.M.*, 50 A.3d 168, 175 (Pa. Super. 2012) (holding that the trial court erred by failing to consider evidence arising after the children moved to Sweden, including evidence regarding the "need for stability and continuity established for the Children during their time

in Sweden, and of the overall best interests of the Children, inasmuch as those interests might involve maintaining the status quo. . . .").  We conclude that no relief is due.

Mother argues in her third claim that the trial court erred by failing to consider Father's failure to provide her with reasonable notice prior to his relocation.  Mother's Brief at 28, 32-36.  Mother explains that she presented the court with a letter from Father's counsel, dated October 27, 2017, which stated that Father would be relocating to Ohio on November 1, 2017.  *Id.* at 34.  Thus, Mother emphasizes, Father notified her of his relocation only five days in advance, in violation of Section 5337(c).  *Id.* at 32-36.

Our child custody statute provides as follows, in relevant part:

**(c) Notice.--**

> (1) The party proposing the relocation shall notify every other individual who has custody rights to the child.
>
> (2) Notice, sent by certified mail, return receipt requested, shall be given no later than:
>
> > (i) the 60th day before the date of the proposed relocation; or
> >
> > (ii) the tenth day after the date that the individual knows of the relocation, if:
> >
> > > (A) the individual did not know and could not reasonably have known of the relocation in sufficient time to comply with the 60-day notice; and

(B) it is not reasonably possible to delay the date of relocation so as to comply with the 60-day notice.

＊＊＊

**(j) Failure to provide reasonable notice.--**The court may consider a failure to provide reasonable notice of a proposed relocation as:

(1) a factor in making a determination regarding the relocation;

(2) a factor in determining whether custody rights should be modified;

(3) a basis for ordering the return of the child to the nonrelocating party if the relocation has occurred without reasonable notice;

(4) sufficient cause to order the party proposing the relocation to pay reasonable expenses and counsel fees incurred by the party objecting to the relocation; and

(5) a ground for contempt and the imposition of sanctions against the party proposing the relocation.

23 Pa.C.S.A. § 5337(c)(1)-(2), (j).

Upon review, Section 5337(j) makes consideration of Father's failure to provide reasonable notice to Mother regarding his relocation optional. The statute indicates that the trial court "may" consider the failure to provide reasonable notice for various purposes, not that the court "shall" or "must" consider it. Even if the language of the statute were mandatory, it is clear that the court did consider this issue. While Father may not have complied with the technical requirements of Section 5337(c), in that he alerted Mother

of his move less than a week in advance, the court found that Mother received reasonable notice nonetheless. Trial Court Opinion, 10/15/18, at 14. The court also found that Father's conduct was excusable under the circumstances, given that he moved to Ohio out of fear for his own safety, and gave little if any weight to the question of reasonable notice. *Id.*; Order, 8/23/18, at 2. Because the record supports the court's determination, Mother's claim fails. *V.B.*, 55 A.3d at 1197.

Next, in her fourth claim, Mother contends that the trial court abused its discretion by finding that the custody and relocation factors favored Father rather than her. Mother's Brief at 28-29, 36-49. Mother focuses her argument on the fact that she was previously the Children's primary caretaker, and that her relationship with the Children has weakened as a result of their move to Ohio and Father's negative influence. *Id.* She maintains that the court's solution of requiring her to travel to Ohio to exercise custody is inadequate to preserve that relationship. *Id.* at 37, 40-41, 46.

We discern no abuse of discretion by the trial court. As we stated above, the court's findings of fact, as well as its weight and credibility determinations, are binding on this Court when the record supports them. *V.B.*, 55 A.3d at 1197. Here, the record supports the court's finding that Mother abandoned the Children into Father's care. The record also supports the court's finding that Father feared for his safety if he stayed in Philadelphia, which motivated his relocation to Ohio. The record confirms that Father has built a stable life

in Ohio for the Children and himself. Two of the Children, J.F. and T.F., report being content in Ohio and wanting to remain there with Father. Further, while it is possible that Father's relocation will further strain Mother's relationship with the Children, that is the consequence of Mother's own misdeeds. The order on appeal provides Mother with substantial partial physical custody time with the Children, in addition to phone contact, and accommodates Mother by allowing her to use her sister's home in Ohio as a neutral exchange location. The order promotes the Children's best interests and allows them to maintain the strongest possible relationship with Mother under the circumstances.

Importantly, Mother's former status as the Children's primary caretaker is not entitled to any particular amount of weight under our law. Prior to the implementation of the current custody statute in 2011, our courts adhered to the "primary caretaker doctrine." The doctrine instructed, "in cases involving an award of primary physical custody 'where two natural parents are both fit, and the child is of tender years, [that] the trial court must give positive consideration to the parent who has been the primary caretaker.'" **M.J.M. v. M.L.G.**, 63 A.3d 331, 337 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2013) (quoting **Commonwealth ex rel. Jordan v. Jordan**, 448 A.2d 1113, 1115 (Pa. Super. 1982)) (emphasis omitted). However, courts are no longer obliged to give positive consideration to a parent's primary caretaker status. As we have explained:

The language of this statute is clear. It explicitly provides that all relevant factors shall be considered by the trial court, and the only factors that should be given "weighted consideration" are factors that "affect the safety of the child[.]" [23 Pa.C.S.A. § 5328(a).] When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. If the Pennsylvania Legislature intended for extra consideration be given to one parent because of his or her role as the primary caretaker, it would have included language to that effect. Stated another way, the absence of such language indicates that our Legislature has rejected the notion that in analyzing both parents, additional consideration should be given to one because he or she has been the primary caretaker.

Furthermore, the consideration the primary caretaker doctrine sought to address (which parent spent more time providing day-to-day care for a young child) is addressed implicitly in the enumerated factors. *See*, *e.g.*, 23 Pa.C.S.A. §§ 5328(a)(3) ("The parental duties performed by each party on behalf of the child."); (a)(4) ("The need for stability and continuity in the child's education, family life and community life."). The considerations embraced by the primary caretaker doctrine have been woven into the statutory factors, such that they have become part and parcel of the mandatory inquiry.

\*\*\*

We hasten to add that this conclusion does not mean that a trial court cannot consider a parent's role as the primary caretaker when engaging in the statutorily-guided inquiry. As discussed above, a trial court will necessarily consider a parent's status as a primary caretaker implicitly as it considers the section 5328(a) factors, and to the extent the trial court finds it necessary to explicitly consider one parent's role as the primary caretaker, it is free to do so under subsection (a)(16). It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case. Our decision here does not change that.

*Id.* at 338-39 (some internal quotation marks and citations omitted; footnote omitted). In this case, it is clear that the trial court considered Mother's past

role when conducting its analysis of the Section 5328(a) and 5337(h) factors, in compliance with **M.J.M.** Thus, Mother is not entitled to relief.

In her fifth and final claim, Mother contends that the trial court abused its discretion by failing to find Father in contempt. Mother's Brief at 49-50. Mother's principal complaint is that Father failed to provide her with regular phone or other electronic contact with the Children, as required by the order of April 20, 2018. *Id.* at 50-51.

As is the case with child custody orders in general, we review a custody contempt order pursuant to an abuse of discretion standard of review. *Garr v. Peters*, 773 A.2d 183, 189 (Pa. Super. 2001). To support a finding of civil contempt, the trial court must determine "(1) that the contemnor had notice of the specific order or decree which she is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent." *Harcar v. Harcar*, 982 A.2d 1230, 1235 (Pa. Super. 2009). Our child custody statute provides as follows with respect to contempt and the award of sanctions:

**(g) Contempt for noncompliance with any custody order.—**

(1) A party who willfully fails to comply with any custody order may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:

(i) Imprisonment for a period of not more than six months.

(ii) A fine of not more than $500.

(iii) Probation for a period of not more than six months.

(iv) An order for nonrenewal, suspension or denial of operating privilege under section 4355 (relating to denial or suspension of licenses).

(v) Counsel fees and costs.

(2) An order committing an individual to jail under this section shall specify the condition which, when fulfilled, will result in the release of that individual.

23 Pa.C.S.A. § 5323(g).

As detailed above, the record supports the trial court's conclusion that Father was not at fault for Mother's lack of contact with the Children. Father testified that the Children are resistant to speaking with Mother and answering her phone calls. N.T. Hearing, 8/17/18, at 26. He maintained that he does not prevent the Children from speaking with Mother. *Id.* To the contrary, he encourages them to do so. *Id.* J.F.'s *in camera* interview supports Father's claim. J.F. described an incident during which Mother called and she did not want to answer the phone. N.T. Interview, 8/17/18, at 64. However, Father directed her to answer and she complied. *Id.* She explained, "he said, . . . . [']Do you want to answer?['] I said [']no.['] He said, 'Well, answer anyway' . . . . I answered, and she said, 'This is the last time I'm going to be calling you, because I have the deadly flu.'" *Id.* at 64-65. Because we are bound by

the court's credibility findings, Mother is not entitled to relief. ***V.B.***, 55 A.3d at 1197.[13]

Based on the foregoing, we conclude the trial court did not commit an error of law or abuse of discretion by granting Father's request to relocate, denying Mother's petition for contempt, and modifying the prior custody award. Therefore, we affirm the court's August 23, 2018 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/19

---

[13] As part of her third claim, Mother argues that the trial court should also have found Father in contempt for his failure to provide her with reasonable notice of his relocation to Ohio. Mother's Brief at 35. Mother did not include this claim in her concise statement of errors complained of on appeal. In addition, she did not include this claim in her petition for contempt, and has apparently raised it for the first time on appeal. Therefore, she has failed to preserve it for our review. ***See In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not included in an appellant's . . . concise statement of errors complained of on appeal are waived."); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Even if Mother had preserved this claim, it would be meritless, as the record supports the court's determination that Father provided Mother with reasonable notice of his relocation and did not act with wrongful intent.