J-A25011-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

E.W.L.                                    :    IN THE SUPERIOR COURT
                                          :        OF PENNSYLVANIA
                                          :
            v.                            :
                                          :
                                          :
                                          :
L.V.D.G.-L.                               :
                                          :
            Appellant                     :    No. 584 MDA 2019

Appeal from the Order Entered March 15, 2019
In the Court of Common Pleas of Dauphin County
Civil Division at No:  2014-CV-7323-CU

BEFORE:  STABILE, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                         **FILED JUNE 03, 2020**

L.V.D.G.-L. ("Mother") appeals from the order entered March 15, 2019, which awarded E.W.L. ("Father") primary physical custody of their children, L.L., a female born in May 2006, A.L., a female born in May 2008, and E.L., a male born in September 2010 (collectively, "the Children"), during the school year.  The order awarded both parties shared legal custody, with the exception that Father would have sole legal custody to make major decisions regarding the Children's education, and regarding any medication necessary to treat attention deficit hyperactivity disorder ("ADHD") or other related diagnoses. After careful review, we affirm in part and vacate in part.

The record reveals that Mother and Father married in 2003, separated in 2011, and divorced in 2016.  Prior to the instant proceedings, the parties exercised custody of the Children pursuant to an agreed-upon order entered April 20, 2018.  The order awarded Mother primary physical custody of the

Children, and awarded Father partial physical custody on the first, second, fourth, and fifth week of each month, from Thursday at 7:00 p.m. until Monday at 9:00 a.m., and on the third week of every month, from Thursday at 5:00 p.m. until Friday at 9:00 a.m. The order awarded shared legal custody to both parties.

On September 13, 2018, Father filed a petition for contempt, as well as a petition for modification of custody. Among other things, Father requested that the trial court enter an order directing that the Children attend public school, rather than continuing to receive homeschooling from Mother. Father based this request on his assertion that Mother was hostile toward him and impaired his relationship with the Children, and on his assertion that E.L. was struggling academically and in need of support that would be unavailable in a homeschool environment. Subsequently, Father filed a petition for expedited relief on October 5, 2018, in which he requested that the Children attend public school immediately, due to E.L.'s educational difficulties and Mother's alleged inability to address the Children's academic needs. The court entered an agreed-upon order on November 1, 2018, which modified the prior custody award slightly, pending a hearing on Father's petitions for contempt and modification. Notably, the order directed that the parties consider obtaining a tutor for E.L.

The trial court conducted a hearing on Father's petitions on March 14, 2019. At the hearing, each party's counsel presented their witnesses' direct

examination testimony as an offer of proof.  Opposing counsel then engaged in cross-examination.

Father presented his case-in-chief first.  Father's testimony focused on his concern that Mother was too "enmeshed" in the Children's lives and failed to encourage his relationship with the Children due to her hostility toward him. He also testified regarding E.L.'s educational struggles and the extent to which public schooling may be more beneficial for him and the other Children than homeschooling by Mother.

Specifically, Father testified that Mother is the Children's homeschool teacher, Sunday school teacher, and soccer coach, and that she is involved in a scouting program for L.L. and A.L.  *Id.* at 26-27.  He complained that Mother often schedules activities during his custody time, most notably soccer events. *Id.* at 23-24, 41-43.  In contrast, Father's testimony suggested that Mother is hostile to his attempts to schedule activities for the Children.  His testimony included an incident during which the Children attended a party at his house and "what the kids were telling [F]ather was, do not tell mom we are having this party because . . . they were afraid they were going to get in trouble if mom found out that they were having fun at dad's house[.]"  *Id.* at 26.

Father also testified that Mother is routinely late to custody exchanges and sometimes fails to bring the Children to exchanges at all.  *Id.* at 12.  He asserted that Mother had been late to forty-nine of eighty possible exchanges since April 2018 and that she simply failed to appear at another six exchanges. *Id.*  Father added that, of Mother's forty-nine late exchanges, she was forty-

five minutes late fifteen times, and between one and two hours late eleven times. *Id.* He recalled an incident during which he had custody of the Children and Mother was late to an exchange. *Id.* at 13. After waiting for over fifteen minutes, Father left the exchange location and sent Mother a text message saying she could pick up the Children at his home. *Id.* Mother then called Father on the phone "and started yelling at him and dropping eff [*sic*] bombs, which she knew well the kids are in the car."[1] *Id.* at 13-14. In addition, Father recalled an incident during which Mother was late to an exchange and he sent a text message reminding her of the custody conciliator's admonition that she should arrive to exchanges on time. *Id.* at 15. Mother responded, "Who cares what [the conciliator] said. She is a fat loser. You're just like her; fat and stupid; fat, fat, fat." *Id.*

Regarding the Children's education, Father testified that E.L. struggles with reading and suffers from ADHD. *Id.* at 17-18. He reported that Mother was resistant to obtaining an evaluation for E.L. and that she took advantage of the evaluation as an opportunity to damage the Children's relationship with him. *Id.* at 17-19. Specifically, Father described an incident during which Mother informed him that she was "making sure the kids know that you think they're stupid which is why they need the testing." *Id.* at 19. He challenged Mother's ability to be an appropriate homeschooler, expressing concern that

---

[1] Mother admitted during cross-examination that she was on speakerphone, such that the Children were able to hear her. N.T., 3/14/19, at 78-79.

the Children lack a routine and that they sometimes "brag about sleeping in to lunch[.]" *Id.* at 21.

Similarly, Father presented the testimony of Mother's brother, D.V.D.G., who expressed concern regarding the quality of education that the Children receive in Mother's care. D.V.D.G. echoed Father's concerns regarding the Children's lack of routine while homeschooling with Mother. He explained as follows on cross-examination:

> One time I was in [Mother's] house. This was a time when [Mother] was unresponsive, and so my mother had called me seeking help; and because we couldn't find my sister, we called the police. And so when we come [*sic*] to the house, the door was actually open and we looked inside, and my wife and I, we weren't able to quickly determine if the house was ransacked or just left open.
>
> So that was the last time I seen [*sic*] the house. It turns out that my sister had forgotten to charge her phone and was sleeping in the middle of the afternoon with three kids.
>
> That's my last reference, and I have received no evidence, I have heard no evidence, that anything has changed with her ability to schedule and plan and structure homeschooling well.

*Id.* at 53.[2]

As for Mother's case-in-chief, she focused her testimony on attempting to refute Father's evidence. Mother testified that Father is uncooperative and

---

[2] D.V.D.G. also expressed concern that Mother exhibits "somewhat racially-motivated views," recalling that he previously shared a very close relationship with Mother, but that their relationship soured after he married a Filipino woman. N.T., 3/14/19, at 49-50, 53. He explained that Mother refused to allow L.L. and A.L. to refer to his wife as "tiya," the Filipino word for "aunt," and that Mother "took the kids away from her." *Id.* at 49-50.

refuses to take the Children to their extracurricular activities, which upsets them, and that he is equally to blame for the parties' co-parenting difficulties. She also presented testimony that the Children are thriving in homeschooling.

During her testimony, Mother challenged Father's insistence that she is too "enmeshed" in the Children's lives, asserting that adults other than herself supervise and schedule the majority of the Children's activities. *Id.* at 68. She maintained that she does not take advantage of the Children's activities to interfere with Father's custody time, asserting that the Children receive notice of their activities and then ask both parents individually whether they may attend. *Id.* at 77, 92. Mother stated that the Children want to participate in these activities and that Father upsets them by preventing them from doing so. *Id.* at 68. She also insisted that Father violates the parties' prior court order by failing to take the Children even to activities that she and Father have agreed to. *Id.* at 92-93.

While Mother admitted making disparaging statements toward Father, she maintained that many of her statements were the product of "mutual errors in co-parenting that have come both ways," and that the situation was "not as one-sided as [F]ather would have us believe." *Id.* at 70. She insisted that she does not making disparaging remarks about Father in the presence of the Children, and did so by accident on only one occasion when she did not realize she was on speakerphone. *Id.* at 78-79. Mother asserted that Father has engaged in spiteful behavior of his own, such as by cancelling medical

appointments scheduled for the Children during her custody time. *Id.* at 72, 90.

Regarding the Children's education, Mother presented the testimony of Linda Blocker, an individual with "extensive experience with homeschooling . . . for roughly [twenty-five] years,"[3] who administered testing to measure the Children's educational progress. *Id.* at 57-58. Ms. Blocker reported that L.L. and A.L. are doing very well, and that E.L., while he previously "lagged behind as many young boys do," is now succeeding with the help of private tutoring. *Id.* at 57. Mother also presented E.L.'s tutor, Janna Match, who testified that the child has made "exceptional" progress and is "among the most quickly progressive students she ever had in this capacity." *Id.* at 60. Nonetheless, Ms. Match conceded on cross-examination that E.L. continues to read at an "[e]arly first" grade level, despite being in the second grade. *Id.* at 62.

At the conclusion of the hearing, the trial court conducted an on-the-record analysis of the custody best interest factors set forth at 23 Pa.C.S.A. § 5328(a), and announced that it would award primary physical custody of the Children to Father during the school year. The court memorialized its decision by order entered March 15, 2019. The court awarded partial physical custody to Mother on the first, third, and fifth weekend of every month, from Friday at

---

[3] Mother's pre-trial statement indicates that Ms. Blocker possesses a master of education degree and is the Children's homeschool evaluator.

4:00 p.m. until Sunday at 7:30 p.m., and on each Wednesday evening from after school until 8:00 p.m. During the summer, the court awarded Mother physical custody for three non-consecutive two-week periods. The court also awarded the parties shared legal custody of the Children, with the exception that Father would have sole legal custody to make major decisions regarding their education, and regarding any medication necessary to treat ADHD or other related diagnoses.[4] Mother timely filed a notice of appeal on April 11, 2019, along with a concise statement of errors complained of on appeal.[5]

_____

[4] The record does not indicate that the trial court entered an order resolving Father's petition for contempt. However, we observe that Father's counsel essentially abandoned the petition for contempt at the hearing, suggesting that the court need not impose any sanction on Mother, other than "[m]aybe a scolding so she understands a court order actually means something." N.T., 3/14/19, at 119.

[5] The record reveals that Father filed a combined petition for expedited relief, contempt, and modification on April 17, 2019. The trial court then entered an agreed-upon order on May 28, 2019, which directed that Mother pay Father $1,000 in attorney's fees and modified the prior order of March 15, 2019, indicating that the parties had "settled" the matter "without prejudice." Order, 5/28/19, at 1 (unnumbered pages).

To the extent the trial court possessed jurisdiction to modify the order of March 15, 2019, despite Mother's pending appeal, it is important to note that the modification did not render this appeal moot. *See* Pa.R.A.P. 1701(a) ("Except as otherwise prescribed by these rules, after an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may no longer proceed further in the matter."); *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect."). The court did not modify any aspect of the order that Mother challenges on appeal, but instead addressed several ancillary issues, such as directing that Mother attend therapy. Thus, the claims underlying Mother's appeal remain unresolved and we proceed to consider them on the merits.

Mother now raises the following claims for our review:

A. Whether the trial court abused its discretion and committed an error of law by awarding [Father] primary physical custody of the [] Children?

B. Whether the trial court abused its discretion and committed an error of law in awarding Father sole legal custody for educational and pharmacological purposes and for finding that the Children should be enrolled in public school instead of continuing their homeschool education?

Mother's Brief at 32 (unnecessary capitalization omitted) (suggested answers omitted).

This Court adheres to the following standard of review in child custody appeals:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). The factors that trial courts must consider when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a), as follows:

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In the instant matter, the trial court included its on-the-record analysis of the Section 5328(a) factors in its opinion. Trial Court Opinion, 5/15/19, at 14-16. The court also elaborated on this analysis, explaining that it reached its custody determination due primarily to E.L.'s academic struggles, and due to its belief that Mother was too "deeply enmeshed with" the Children, to the degree that she excluded Father from the Children's lives. *Id.* at 16-17. The court added that it believed Mother was primarily responsible for the parties' high level of conflict. *Id.* at 17. The court concluded as follows:

> It is uncontroverted that the two older children are excelling academically in the homeschool environment, however, as I stated on the record, the children should not be split up and should also attend the same school. There was no evidence presented that the two older children's educational needs will not be met in [Father's school district], including access to computer resources, science and technology courses, as well as providing them a regular routine. The overall circumstances of this case, summarized above, reveal that the children need their Mother to be less enmeshed in their lives including most notably with their

schooling. This disentanglement from Mother in the educational setting is necessary and will be in their best interests . . . .

*Id.* at 18.[6]

In her first claim on appeal, Mother argues that the trial court misapplied the Section 5328(a) factors and overlooked the Children's best interests when it awarded primary physical custody to Father. Mother's Brief at 43, 46-55. She discusses each of the factors in the argument section of her brief, other than Section 5328(a)(16), contending that they either weighed in favor of her, were neutral, or were inapplicable. *Id.* Mother places particular emphasis on her argument that she has served as the Children's primary caretaker for most of their lives and that she is more capable of providing for their needs. *Id.* at 47-52.

In relation to this argument, Mother acknowledges that this Court must defer to the trial court's weight and credibility determinations when the record supports them. *Id.* at 45. However, she insists that the weight and credibility determinations in this case are "due less deference than normal" because the witnesses did not present their direct testimony in question-and-answer form and instead employed offers of proof. *Id.* at 45, 54. Mother argues that this

---

[6] Further, the trial court explained that it awarded Father sole legal custody over medication for ADHD or related diagnoses because Mother had "delayed" in obtaining medication for E.L. *See* Trial Court Opinion, 5/15/19, at 18 ("I granted Father sole authority to make decisions concerning ADHD medication and medication for related diagnoses because Mother has delayed, without adequate excuse, pursuing this potential proven treatment to assist children with ADHD.").

arrangement denied the court the usual opportunity to observe the witnesses as they testified and impaired its ability to assess their credibility. *Id.* at 45. She also suggests that Father's evidence was misleading to the court, because he presented as exhibits "selective emails . . . some going back several years," which he used to villainize her. *Id.* at 45, 53-54.

After careful review of the certified record, we discern no error of law or abuse of discretion. As discussed above, Father's evidence during the hearing established that Mother has been overtly hostile to his relationship with the Children. Mother has disparaged Father, even in the Children's presence, and has failed repeatedly to comply with the parties' prior custody order, by either appearing late to custody exchanges, or by failing to bring the Children to the exchanges entirely. The record also indicates that Mother has endeavored to impair Father's relationship with the Children by encouraging the Children to participate in an excessive number of extracurricular activities during Father's custodial time. Notably, it was Mother's own testimony that most strongly supported the existence of this problem. She testified regarding one incident, for example, during which Father refused to take the Children to six different activities during a single weekend, including "a youth cookie party . . . youth pancake breakfast, indoor soccer, Bible study, some additional soccer event, and . . . drum lessons[.]" N.T., 3/14/19, at 75, 110.

While Mother contends that the trial court should have rejected Father's evidence and weighed the Section 5328(a) factors in her favor, this argument

is clearly specious. Mother claims that this Court should not defer to the trial court's credibility and weight determinations because the witnesses presented their direct testimony via offers of proof, and the court did not have the usual benefit of observing the witnesses testify during direct examination. However, Mother waived this claim by failing to object to the offer of proof procedure during the hearing. *See State Farm Mut. Auto. Ins. Co. v. Dill*, 108 A.3d 882, 885 (Pa. Super. 2015) (quoting *Lockley v. CSX Transp. Inc.*, 66 A.3d 322, 325 (Pa. Super. 2013)) ("'[T]o preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue.'"); *see also* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). What Mother also fails to acknowledge is that the court did have the opportunity to observe the witnesses as they testified, as counsel for both parties conducted their cross-examination in the traditional question-and-answer form. Thus, Mother's claim is meritless.

Mother's suggestion that we should disregard the trial court's credibility and weight determinations because Father's exhibits were too old is equally unavailing. The certified record on appeal does not contain any of the exhibits admitted during the hearing. However, Father included the exhibits in his supplemental reproduced record. Because Mother does not challenge the authenticity of these exhibits, we may consider them. *See Commonwealth*

*v. Barnett*, 121 A.3d 534, 545 n.3 (Pa. Super. 2015), *appeal denied*, 128 A.3d 1204 (Pa. 2015), *cert. denied*, 136 S.Ct. 2391 (2016) ("While this Court generally may only consider facts that have been duly certified in the record, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it.") (citation omitted).

Upon review, many of Father's exhibits do not have dates. Of those that do, Father's oldest exhibit is Plaintiff's Exhibit 4, which consists of two emails dated March 22, 2015. This exhibit is not particularly damaging to Mother, as it consists of a civil discussion regarding what type of schooling the Children should receive. The next oldest exhibit, Plaintiff's Exhibit 39, is an email dated January 30, 2018, just over a year prior to the hearing on March 14, 2019. This belies Mother's assertion that Father misled the court by using emails "going back several years" to villainize her. We see no basis to disturb the trial court's credibility or weight determinations, and we affirm the portion of the court's order awarding primary physical custody of the Children to Father.[7]

_____

[7] As part of this claim, Mother also contends that the trial court should have interviewed the Children, maintaining that they were sufficiently mature to have a well-reasoned preference. Mother's Brief at 43, 50. Mother waived this contention as well, as she did not request that the court interview the Children during the hearing, nor did she include a claim that the court erred by failing to interview the Children in her statement of questions involved and concise statement. *See* Pa.R.A.P. 302(a); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.").

In Mother's second claim, she argues that the trial court violated ***Staub v. Staub***, 960 A.2d 848 (Pa. Super. 2008), by ordering that the Children attend public school, and assails the court's decision to award Father sole legal custody over educational decisions. Mother's Brief at 43, 56-58, 62. She maintains that the Children are thriving with their homeschool education and that there is no evidence to support the court's conclusion that public school will be better suited to meet their needs. ***Id.*** at 43-44, 48-49, 56-62. Even assuming that the record supports the court's decision that E.L. should attend public school, Mother continues, that decision does not require that L.L. and A.L. attend public school as well. ***Id.*** at 50, 56, 61. Mother also challenges the portion of the court's order awarding Father sole legal custody over decisions regarding whether to provide the Children with ADHD medication. ***Id.*** at 47, 56. Mother directs our attention to her testimony that she would abide by the recommendation of E.L.'s pediatrician regarding medication for ADHD, and characterizes the court's award as "an extreme response to the evidence of record[.]" ***Id.*** at 48, 56.

Mother appears to misunderstand this Court's holding in ***Staub***. In that case, the appellant appealed from the trial court's order denying his petition for special relief, in which he requested that the court prevent the appellee from continuing to homeschool the parties' children. ***Staub***, 960 A.2d at 849. On appeal, the appellant requested that this Court "to adopt a clear but narrow rule that requires children to attend public schools when parents who share

legal custody cannot agree on home schooling versus public schooling." *Id.* This Court declined the appellant's request, holding instead that trial courts must decide between public schooling and homeschooling using the same best interest standard that applies to other child custody decisions. *Id.*

Contrary to Mother's contentions, nothing about the trial court's decision in this matter violated *Staub*. The court's opinion confirms that it reached its decision that the Children should attend public school by considering their best interests, as *Staub* required. *See* Trial Court Opinion, 5/15/19, at 19 ("[M]y decision to grant Father sole authority to decide education issues and end homeschooling as of 2019-2020, was made upon careful consideration of all factors relevant to the [C]hildren's best interests, as fully set forth above."). Moreover, the record supports the court's decision. As we discussed in relation to Mother's first claim, the record indicates that Mother has used her position of influence in the Children's lives as their primary custodian and homeschool teacher to impair their relationship with Father. Mother failed to comply with the parties' prior custody order and spoke disparagingly about Father, even in the Children's presence. Further, Mother attempted to involve the Children in an excessive number of extracurricular activities during Father's custodial time.

The record also belies Mother's assertion that she is capable of providing an appropriate homeschooling environment for the Children. Both Father and Mother's brother, D.V.D.G., testified regarding the apparent lack of routine

and structure in Mother's home. N.T., 3/14/19, at 21, 53. In addition, when Mother proved ineffective in addressing E.L.'s academic struggles, she resisted obtaining the help that he needed to improve. Mother failed to acknowledge, and may have even concealed, E.L.'s struggles by resisting Father's request that the child receive an evaluation. Mother then used Father's concern for E.L., which proved to be entirely valid given the child's eventual diagnosis of ADHD, as yet another way to undermine his relationship with the Children. As Father testified during his direct examination, Mother informed the Children that Father believed "they're stupid which is why they need the testing." *Id.* at 19. Given this evidence, it was within the trial court's discretion to conclude that public schooling would be in the Children's best interests and that Father should exercise sole legal custody over the Children's educational decisions.

However, we reach a different conclusion with respect to the trial court's decision to award Father sole legal custody regarding medication for ADHD and related diagnoses. As noted above, the court explained that it awarded Father sole legal custody in this area because Mother "delayed" in obtaining ADHD medication for E.L. The record does not support this finding. During the hearing, the court heard minimal testimony on the issue of medication. None of this testimony suggested that Mother had delayed pursuing medication for E.L., nor did it indicate that E.L. was even in need of medication in the first place. During direct examination, Father testified regarding E.L.'s evaluation, noting that the child received a diagnosis of ADHD, and "that one

of the ways to deal with ADHD is to give medication, which as Your Honor is aware, had been discussed in the pretrial."[8]  N.T., 3/14/19, at 18.  Mother testified during cross-examination that E.L. had an appointment with his pediatrician following a pretrial conference and that the pediatrician "decided he didn't have enough information[.]"[9]  *Id.* at 111.  She further testified that, if E.L.'s pediatrician "would recommend medication, then that's what we will go with.  He had not at this time."  *Id.*  Thus, at best, the record indicates that the parties discussed the possibility of obtaining medication for E.L. at their pretrial conference, that Mother brought the idea to the attention of E.L.'s pediatrician, and that the pediatrician did not recommend medication.  The record does not suggest that Mother delayed in obtaining recommended or necessary medication for E.L. such that an award of sole legal custody to Father would be in the Children's best interests.  We conclude that the court abused its discretion and we vacate that portion of the March 15, 2019 order.

_____

[8] We observe that E.L.'s evaluation does not recommend that the child receive ADHD medication.  The evaluation, which is eight pages long, addresses ADHD medication for all of two sentences.  It states, "Problems with attention are sometimes treated with medication. . . . Obviously, any indications, risks or benefits of medication should be reviewed with and initiated by a physician."  Plaintiff's Exhibit 20 (E.L.'s evaluation) at 8.  This exhibit, like the others, does not appear in the certified record but does appear in Father's supplemental reproduced record.  *See Barnett*, 121 A.3d 534, 545 n.3.

[9] In its opinion, the trial court states that Mother admitted failing to provide the information that the pediatrician requested.  Trial Court Opinion, 5/15/19, at 9 (citing N.T., 3/14/19, at 111).  Upon review, the relevant transcript page does not contain the statement by Mother that the court describes.

In its place, the parties will continue to share legal custody of the Children with regard to medication in accordance with their prior custody order, subject to their ability to request modification of legal custody in the future.

In summation, we discern no abuse of discretion or error of law by the trial court in awarding Father primary physical custody of the Children, and in awarding Father sole legal custody over the Children's educational decisions. However, because the record does not support the court's finding that Mother delayed in obtaining ADHD medication for E.L., we conclude that the court abused its discretion by awarding Father sole legal custody over medication for ADHD and related diagnoses. We must therefore vacate that portion of the March 15, 2019 order. The parties will continue to share legal custody regarding medication in accordance with their prior custody order, subject to their ability to request modification of legal custody in the future. We affirm the order in all other respects.

Order affirmed in part and vacated in part. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/03/2020

- 20 -